# In the United States Court of Federal Claims

No. 21-2104
(Filed:  6 July 2022)[*]

```
*****************************************
LB&B ASSOCIATES, INC.,                   *
                                         *
               Plaintiff,                *
                                         *
v.                                       *
                                         *   Post-Award Bid Protest; Best-Value
THE UNITED STATES,                       *   Determination; Arbitrary and Capricious;
                                         *   Motion to Dismiss; Technical Evaluation;
               Defendant,                *   Motion for Judgment on the Administrative
                                         *   Record.
and                                      *
                                         *
EMCOR GOVERNMENT SERVICES, INC.,         *
                                         *
               Defendant-Intervenor.     *
                                         *
*****************************************
```

    *Benjamin N. Thompson* of Wyrick Robbins Yates & Ponton LLP, with whom was *Sophia V. Blair*, both of Raleigh, NC, for plaintiff.

    *Elizabeth A. Speck*, Trial Attorney, Commercial Litigation Branch, Civil Division, of the U.S. Department of Justice, with whom were *Douglas K. Mickle*, Assistant Director, *Patricia M. McCarthy*, Director, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, all of Washington, DC, and *Stephani L. Abramson*, of counsel, of the National Archives and Records Administration, of College Park, MD, for defendant.

    *Shlomo D. Katz* of Brown Rudnick LLP, with whom was *Kenneth B. Weckstein*, both of Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

**HOLTE, Judge.**

---

[*] This opinion was originally filed under seal on 30 June 2022 pursuant to the protective order in this case.  The Court provided the parties an opportunity to review this opinion for any proprietary, confidential, or other protected information and submit proposed redactions by 6 July 2022.  The parties' proposed redactions on 6 July 2022.  The Court accepts the parties' proposed redactions and reissues the order, with redacted language replaced as follows: "[XXXXX]."

Plaintiff LB&B Associates, Inc. brings this post-award bid protest challenging the National Archives and Records Administration's ("NARA") award of a task order to defendant-intervenor EMCOR Government Services, Inc. for maintenance services at the National Archives' Facilities I and II.  LB&B, the incumbent contractor, has performed maintenance services at the facilities for over sixteen years and argues NARA's reevaluation of its proposal and EMCOR's proposal was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law.  Plaintiff further argues NARA's best value determination was arbitrary and capricious and asserts the agency's procurement process disparately treated LB&B and caused LB&B to suffer prejudice.  Pending before the Court is plaintiff's motion for judgment on the administrative record ("MJAR"), the government's cross-MJAR and motion to dismiss ("MTD"), and defendant-intervenor's cross-MJAR and MTD.  For the following reasons, the Court denies plaintiff's MJAR, grants the government and defendant-intervenor's MJARs, and alternatively grants the government and defendant-intervenor's motions to dismiss pursuant to Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC").

## I.  Background

### A.  The Contract and Request for Quotation

On 18 March 2021, NARA issued Request for Quotation #88310321Q00023 ("RFQ") under the General Services Administration ("GSA") Multiple Award Schedule ("MAS") or the Federal Supply Schedule ("FSS") and sent the RFQ to five vendors listed under GSA MAS #561210FAC, Complete Facilities Maintenance and Management.  *See* Admin. R. ("AR") at 1 (Acquisition Plan), Tab 2 (RFQ), 4718 (CO Statement of Facts), ECF No. 22.  The RFQ requested quotations for complete facilities maintenance ("CFM") services for Archives I, the National Archives Building in Washington, DC, and Archives II, located in College Park, Maryland, for a base year and four option years.  *See* AR at 2 (Acquisition Plan), 13 (RFQ), 4718 (CO Statement of Facts).  The RFQ required vendors to quote a fixed price for all work in the Performance Work Statement ("PWS"), except for "Additional Services work," for which vendors were to quote hourly rates.  AR at 13–14 (RFQ).

The RFQ specifies in detail personnel requirements, including describing key personnel job titles, major duties, and qualifications.  AR at 22–49 (RFQ).  The RFQ also includes a list of key subcontractors.  AR at 48 (RFQ).  The RFQ further provides:

> Evaluation of past performance is not limited to information supplied by the vendor or on behalf of the vendor.  The Government may consider past performance information from various sources including, but not limited to CPARS (Contractor Performance Assessment Reports System), PPIRS (Past Performance Information Retrieval System), other government sources, agency records and information, or publicly available information.

AR at 216 (RFQ).  The RFQ includes a relevant past performance questionnaire that was to be "used to evaluate the past performance for the vendor," followed by a grading/check sheet to be used in evaluating the past performance of a vendor.  AR at 221, 223–25 (RFQ).  It then provides a performance requirements summary (PRS) that "captures key requirements of the Performance

Work Statement (PWS) at an outcome level (performance standard) and states the performance level and method of surveillance for the requirement." AR at 246 (RFQ). The RFQ also includes an overview of the major systems. AR at 315–509 (RFQ).

The RFQ provides, "[t]he vendor's quotation will be evaluated in accordance with FAR 8.405-2(d) using the following evaluation factors[:]" (1) technical understanding and approach; (2) management and quality control; and (3) relevant past performance. AR at 220 (RFQ). "All evaluation factors other than cost or price, when combined, are more important than cost or price," and "[v]endor selection will be based on the best overall value to the Government." *Id.*

Four vendors provided quotations, including LB&B, EMCOR, [XXXXXXXXXXXXXX XXXXXXXXXXXXXXXXX], and [XXXXXXXXXXXX].[1] Remand AR at 4925, ECF No. 38 (Vendor Selection Report ("VSR")).

### B. LB&B's Proposal

On 25 May 2021, LB&B submitted its CFM proposal to NARA. AR at 2050, 2058 (LB&B's Proposal). LB&B leans on its breadth of experience, stating its "personnel maintain more than 105 federal buildings, courthouses, military, and state-owned facilities," AR at 2060, including plaintiff's experience as the incumbent contractor. AR at 2054 (LB&B's Proposal). As the incumbent, LB&B claims it "has cost-effectively managed resources, personnel, equipment, facilities, subcontractors, and vendors to maintain excellent customer service and support." AR at 2058 (LB&B's Proposal). LB&B further stated, "[their] proactive operations and maintenance management approach has resulted in cost-savings and improved efficiency solutions . . . ." *Id.* LB&B reiterated its commitment and stressed its incumbency by stating: "[LB&B's] goal is to continuously provide precisely maintained facilities at Archives I and II during the next contract years. We are committed to NARA and will implement the best practices we have honed over our more than 15 years of experience there." AR at 2062 (LB&B's Proposal). LB&B's overall proposal for the five-year period (base year plus four option years) totaled [XXXXXXXXXXX]. AR at 2507 (LB&B's Proposal).

### C. EMCOR's Proposal

On 26 May 2021, EMCOR submitted its CFM proposal to NARA. AR at 1649 (EMCOR's Proposal). EMCOR "has an established record of providing experience, industry leadership, and understanding of top tier facilities." *Id.* EMCOR stressed its experience by referring to "individual and institutional experience we retain from our previous contract with NARA, where EMCOR's predecessor company, Consolidated Engineering Services, Inc., provided [CFM] for Archives I from January 1999 to December 2003, and Archives II from January 1993 to December 2003 . . . ." AR at 1654 (EMCOR's Proposal). EMCOR's overall proposal for the five-year period (base year plus four option years) totaled $90,501,590.00. AR at 1993–97 (EMCOR's Proposal).

---

[1] NARA excluded [XXXXXXXX] from the best value decision as its proposal contained a combination of significant weaknesses that equated to a deficiency. AR at 4926 (Vendor Selection Report).

### D.  First Evaluation, GAO Protest, and Reevaluation

The evaluation team consisted of three members:  Timothy Edwards (Chairperson); Ngan Pham (Evaluator); and John Bartell (Evaluator).  *See* AR at 3062 (VSR).  The evaluation team conducted the first evaluation from 7 June 2021 to 21 July 2021.  AR at 3063 (VSR).  The evaluation team held a consensus meeting from 29 June 2021 to 21 July 2021 to review and finalize evaluation comments for each vendor.  *Id.*  The team unanimously agreed EMCOR provided the best value.  AR at 3064 (VSR).

On 17 September 2021, LB&B filed a protest with the Government Accountability Office ("GAO") challenging NARA's award to EMCOR.  AR at 3124 (LB&B Protest Letter).  On 5 November 2021, the GAO dismissed LB&B's protest because LB&B had filed the current protest with this Court.  AR at 4745 (GAO Decision).  After the GAO dismissed LB&B's protest, on 15 December 2021, the Court remanded the matter to NARA for reevaluation.  Remand AR at 4924 (VSR).  The original evaluation team conducted a new evaluation of the quotes between 3 January 2022 and 19 January 2022.  Remand AR at 4925 (VSR).  The team then conducted a consensus evaluation from 14 January 2022 to 19 January 2022.  *Id.*  After this evaluation, the evaluation team again unanimously agreed EMCOR offered the best value.  *Id.*

### E.  Procedural History Before this Court

On 29 October 2021, plaintiff filed a complaint, ECF No. 1.  On 3 November 2021, defendant-intervenor intervened in this case, ECF No. 13.  Plaintiff then filed an amended complaint on 23 November 2021, ECF No. 26, and an MJAR on 7 December 2021, ECF Nos. 28, 29.  On 15 December 2021, the government filed an unopposed motion for a voluntary remand to conduct a new source selection evaluation ("Def.'s Remand Mot."), ECF No. 31, which the Court granted, ECF No. 32.

After remand, on 28 January 2022, the government filed a notice stating it completed its reevaluation and affirmed its award to EMCOR, ECF No. 34.  On 16 February 2022, plaintiff filed a second amended complaint incorporating the Remand AR ("Second Am. Compl."), ECF No. 39.  On 2 March 2022, plaintiff filed its second MJAR, ECF No. 43, and a supporting memorandum, ECF No. 44.  On 16 March 2022, the government filed an unopposed motion to amend/correct the AR, ECF No. 47, which the Court later granted, ECF No. 50.  Also on 16 March 2022, defendant-intervenor filed an MJAR response, cross-MJAR, and an MTD for failure to state a claim upon which relief can be granted, ECF No. 48, and a supporting memorandum ("Def.-Int.'s MTD & Cross-MJAR"), ECF No. 49.  The government too filed an MJAR response, cross-MJAR, and MTD for failure to state a claim ("Def.'s MTD & Cross-MJAR"), ECF No. 51.  Plaintiff then filed a reply in support of its MJAR and response to defendant-intervenor's cross-MJAR ("Pl.'s Reply Def.-Int.'s MJAR"), ECF No. 64, and later a corrected reply and response to the government's cross-MJAR ("Pl.'s Reply Def.'s MJAR"), ECF No. 69.  On 14 April 2022, defendant-intervenor filed its reply in support of its cross-MJAR ("Def.-Int.'s Reply Cross-MJAR"), ECF No. 70.  On 15 April 2022, the government filed its reply in support of its cross-MJAR ("Def.'s Reply Cross-MJAR"), ECF No. 70.

On 16 March 2022, the government filed a motion to supplement the AR with declarations ("Def.'s Mot. Suppl."), ECF No. 52.  On 18 March 2022, plaintiffs filed a cross-motion and response to the government's motion to supplement the AR with declarations and, in the alternative, a motion for additional discovery and a stay (Pl.'s Disc. Mot.), ECF No. 55.  The government then replied in support of its motion to supplement and responded to plaintiffs' motion for additional discovery and stay ("Def.'s Mot. Suppl. Reply."), ECF No. 58.  On 30 March 2022, plaintiff filed a reply in support of its motion for additional discovery and stay ("Pl.'s Reply Disc. Mot."), ECF No. 62.  On 28 April 2022, the Court held a status conference to discuss the parties' cross-motions for AR supplementation, and during the status conference the parties' agreed to a joint stipulation regarding the evaluators' positions within NARA, ECF No. 72.  On 12 May 2022, the government filed the joint stipulation ("Joint Stip."), ECF No. 78, with an accompanying exhibit ("Joint Stip. Ex."), ECF No. 78-1.  The Court next scheduled, then rescheduled oral argument on the parties' cross-MJARs, ECF Nos. 77, 79.  The Court held oral argument on 26 May 2022.  *See* Oral Argument Tr. ("Tr."), ECF No. 81.

## II.  Parties' Arguments

### A.  The Rationality of NARA's Reevaluation

Plaintiff asserts NARA erred in the "award of a task order . . .  for [CFM] at the Archives I and II facilities to EMCOR . . . ."  Pl's MJAR at 1.  Plaintiff claims "NARA's procurement process was highly flawed, and that NARA assessed LB&B's quotation against unstated evaluation criteria, failed to account for responsive material in LB&B's quotation, and treated LB&B disparately and EMCOR favorably from other vendors."  *Id.*  Plaintiff continues, "NARA's best value determination was arbitrary, capricious, and constituted an abuse of discretion because it was premised on NARA's improper technical evaluation and lacked adequate justification and documentation in contravention of the RFQ and applicable law."  *Id.*  "These errors have prejudiced LB&B because, absent NARA's arbitrary, irrational, and capricious actions, LB&B . . . would have been awarded the Task Order . . . ."  *Id.*

The government argues:  "LB&B has failed to present any evidence supporting [its] claims, much less the hard facts that this Court's precedent requires.  Thus, LB&B has failed to satisfy its burden of establishing that NARA's award decision lacked a rational basis."  Def.'s MTD & Cross-MJAR at 7.  The government adds, "[NARA] would have found that EMCOR's . . . technically superior quotation presented the best value to the Government 'even if LB&B did not have any weaknesses.'"  *Id.* at 6.  "Thus even if there were merit to LB&B's subjective disagreements with the agency's evaluation, LB&B cannot demonstrate any prejudicial error that would warrant setting aside NARA's award decision."  *Id.*

### B.  The Composition of NARA's Evaluation Team and NARA's Alleged Failure to Follow the Vendor Screening Plan

The government claims LB&B fails "to state a claim upon which relief can be granted" when LB&B contends NARA erred in failing to comply with the Vendor Screening Plan ("VSP").  Def.'s MTD & Cross-MJAR at 8–9.  The government argues, "the VSP is an internal NARA document" and "internal documents like the VSP are guidelines [which] do not confer

any rights to offerors." *Id.* at 9 (citations omitted). The government also argues because "both the SSA and the parties knew in advance th[e] evaluation team might not conduct price-blind individual evaluations," LB&B's protest is time-barred because "[w]hen an offeror has notice of the agency's proposed corrective action, it cannot wait until after award to challenge that proposed corrective action." *Id.* at 10. The government further posits, "LB&B waived its ability to challenge NARA's use of the same evaluation panel when it raised no objection to NARA's motion to remand." *Id.* at 6. Alternatively, the government argues plaintiff's "claims fail on the merits." *Id.* at 9.

Plaintiff argues, "this Court has held that an agency's failure to follow a source selection plan ('SSP') absent an articulated reason renders the agency's procurement decision arbitrary and may serve as a valid basis for a bid protest." Pl.'s Reply Def.'s MJAR at 2. Plaintiff argues, "NARA [adopted] but arbitrarily and prejudicially deviated from its [VSP] without articulating a reason for doing so." *Id.* at 3. Plaintiff continues, "the Reevaluation and the VSP prohibited non-price-blind technical evaluations [yet NARA] failed to appoint a new evaluation team." *Id.* Furthermore, plaintiff notes the government stated in its motion for a voluntary remand that "NARA was unsure whether it will use the evaluation team from the prior evaluation, whether it will add members to the prior evaluation team, or whether it will select new evaluation team members." *Id.* at 4. NARA did not update LB&B regarding which action it would take and therefore "LB&B had no basis to object to the possibility of a non-price-blind evaluation. *Id.* at 5.

### C. The Government's Motion to Supplement the Administrative Record and Plaintiff's Opposition and Cross-Motion for Additional Discovery

The government moved "to supplement the administrative record, or alternatively the Court's record with the declaration of John Bartell . . . , and the declaration of Ngan Pham . . . ." Def.'s Mot. Suppl. at 1. The government states, "it is appropriate to include these declarations . . . because the [RFQ] for the procurement at issue in this protest states that the NARA can consult a wide variety of sources when evaluating offeror's quotations." *Id.* (citation omitted). It claims, "supplementation is appropriate because the declarations are necessary for meaningful judicial review as the information does not otherwise exist in the record." *Id.* at 2.

Plaintiff states, "[s]upplementation of the record is permitted where 'the omission of extra-record evidence precludes effective judicial review' [and supplementation] 'is not prohibited and may be used when it is necessary for the COFC to gain a complete understanding of the issues before it.'" Pl.'s Disc. Mot. at 2 (citations omitted). Plaintiff claims, "supplementing the Court or Administrative Record with the declarations will not ensure effective judicial review," adding, "Mr. Pham and Mr. Bartell's purported personal knowledge of LB&B's past performance as the incumbent vendor is inappropriate and in fact *frustrates* effective judicial review." *Id.* at 2–3. Plaintiff asks to "be allowed to conduct limited discovery to investigate and respond to assertions made in the [d]eclarations" if the Court grants the government's motion to supplement. *Id.* at 2.

## III.  Legal Standard

## A.  Bid Protest Jurisdiction & APA Standard of Review

The Tucker Act grants this Court jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  To be an interested party, a protestor must show it is an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *PDS Consultants, Inc. v. United States*, 907 F.3d 1345, 1356 (Fed. Cir. 2018) (quoting 31 U.S.C. § 3551(2)(A)).

In rendering such judgment, this Court "review[s] the agency's decision pursuant to the standards set forth in section 706 of title 5 [of the Administrative Procedure Act ('APA')]."  28 U.S.C. § 1491(b)(4); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  "Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. §706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000)).  Under this standard, "a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  "Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).  "The arbitrary and capricious standard applicable here is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."  *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

## B.  Judgment on the Administrative Record in a Bid Protest

"RCFC 52.1(c) provides for judgment on the administrative record."  *Huntsville Times Co. v. United States*, 98 Fed. Cl. 100, 104 (2011); *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005).  Rule 52.1(c) was "designed to provide for trial on a paper record, allowing fact-finding by the trial court."  *Bannum*, 404 F.3d at 1356.

This Court may set aside a contract award if:  "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Domenico Garufi*, 238 F.3d at 1332.  "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'"  *Id.* at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).  "[D]e minimis errors do not require the overturning of an award."  *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (emphasis omitted).

"De minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are." *Id.* (quoting *Andersen Consulting v. United States*, 959 F.2d 929, 935 (Fed. Cir. 1992)).  A bid protest plaintiff must establish alleged "errors in the procurement process significantly prejudiced [the plaintiff]" by showing "there was a 'substantial chance' it would have received the contract award but for the errors." *Bannum*, 404 F.3d at 1353 (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

Technical ratings fall within a category of "discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).  "Procurement officials have substantial discretion to determine which proposal represents the best value for the government." *Id.*  A protester alleging unequal treatment in a technical evaluation "must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020).

### C.  Permanent Injunction

When deciding whether a permanent injunction is warranted, a court considers:

(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (citations omitted).

### D.  Motion to Dismiss

A Court should dismiss a complaint under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Rowe v. United States*, 151 Fed. Cl. 268, 271 (2020) (quoting *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)).  In reviewing a motion to dismiss for failure to state a claim, the Court "must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327–28 (Fed. Cir. 2006) (citation and quotation marks omitted).  However, "a complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Acceptance Ins. Companies, Inc. v. United States*, 583 F.3d 849, 853 (Fed. Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  In other words, the facts as alleged "must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555 (citations omitted).  As the Federal Circuit recently reiterated in *Harmonia Holdings*, a protestor's speculative pleadings fail to state a claim and the protest must be dismissed. *Harmonia Holdings v. United States*, 999 F.3d 1397, 1407 (Fed. Cir. 2021).

## IV.  Whether NARA's Reevaluation was Rational

**A.  Whether NARA's Reevaluation of LB&B's Quotation was Rational**

For Count I.B, plaintiff argues NARA's reevaluation of LB&B's proposal was irrational, unlawful, and inconsistent with the RFQ terms.  Pl.'s Second Am. Compl. at 34–46.  Plaintiff argues NARA's technical reevaluation of the quotations was arbitrary and capricious when it assigned LB&B's proposal the following four weaknesses:  (1) using two subcontractors for switchgears and transformers work; (2) isolated personnel incidents; (3) failure of the central plant Tridium BAS and Chiller2a; and (4) current irrigation practices as the incumbent.  Pl.'s MJAR at 17–27.

**1.  Switchgear and Transformer Work**

Plaintiff argues NARA's assigned weakness for switchgear and transformer work "was arbitrary and capricious because NARA evaluated LB&B against an unstated evaluation criterion and NARA failed to articulate a rational basis to support that weakness."  Pl.'s Reply Def.'s MJAR at 15 (citations omitted).  For support, plaintiff notes, "the RFQ does not provide that vendors should only propose one subcontractor for switchgear and transformer work."  Pl.'s MJAR at 18.  Plaintiff argues, "proposing two subcontractors does not pose a risk to performance" and the RFQ supports proposing separate contractors for each facility as the two facilities are distinct and separated by 10 miles.  Pl.'s MJAR at 18.

The government responds:  LB&B did not explain "how it would coordinate the work between the two subcontractors"; it was reasonable for the agency to conclude using two different contractors for electrical work would increase the risk of unsuccessful performance; the agency explained the electrical system was the most important system within any facility; LB&B failed to show the agency in fact applied an unstated evaluation criteria; "it was well-within the evaluation team's discretion to rely upon information about LB&B's performance on the incumbent contract."  Def.'s MTD & Cross-MJAR at 20–26.

The Court first considers the RFQ language as the RFQ provides the standard to which NARA held vendors' proposals.  AR at 13 (RFQ) ("All work must be performed under the terms and conditions of this task order . . . .").  The RFQ states:  "The Vendor must test and inspect all switchgear equipment, i.e., transformers, protective relays, circuit breakers.  Individuals performing the testing and inspections must be regularly involved in the maintenance and repairs of high voltage switchgear equipment and be on the list of Potomac Electric Power Company (PEPCO) certified inspectors."  AR at 78.  The RFQ also provides:  "Transformers may contain polychlorinated biphenyl (PCBs) and must be inspected in accordance with MAXIMO and EPA regulations," and "[a]ll testing of electrical controls and switchgears must be recorded as required in MAXIMO."  *Id.*  Notably, the RFQ fails to specify how many subcontractors a vendor should propose for switchgear and transformer work.  *See id.*

LB&B proposed two subcontractors for switchgear and transformer work, namely [XXXXXXXXXXXXX] at Archives II and [XXXX] at Archives I.  AR at 2112.  NARA assigned LB&B a weakness for proposing two subcontractors, noting the electrical system is crucial as it provides power to all other systems, and LB&B's proposal poses a risk to successful

performance.  Remand AR at 4961–62 (Consensus Evaluation); *see* Tr. at 73:2–7 (plaintiff admitting switchgear and transformer work is included in the RFQ's key subcontractor list, *see* AR at 48).  NARA stated the PWS "requires the same quality of workmanship for both Archives I & II electrical work" and "[u]sing [XXXXXXX] for A2 electrical work and [XXXX] for A1 electrical work will create challenges such as different maintenance procedures, performance standards, and inconsistent reporting from the subcontractors."  Remand AR at 4961 (Consensus Evaluation), 4879–80 (CO's reevaluation explanation letter).

        Although the RFQ does not expressly limit vendors to only one contractor for switchgear and transformer services, plaintiff admitted "[NARA] can rationally assign a strength or a weakness for subcontractor selection."  Tr. at 74:3–6.  Plaintiff added "[i]n fact . . . in the RFQ, Section 8.1[, AR at 48], the agency places a lot of significance on key subcontractors because of the various systems and components at our facilities and those subcontractors cannot be changed . . . without the consent of the contracting officer's representative."  Tr. at 74:6–14.  Intrinsic to NARA's evaluation of a vendor's subcontractors, the agency may consider its preference for a vendor's proposed subcontractor or subcontractors, and the agency may consider whether using two vendors might result in different "maintenance procedures, performance standards, and inconsistent reporting from the subcontractors."  Remand AR at 4961–62 (Consensus Evaluation); *see Domenico Garufi*, 238 F.3d at 1332 (contracting officers "'are entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process" (citation omitted)); *NEQ, LLC v. United States*, 88 Fed. Cl. 38, 48 (2009) ("[I]t is well-settled that 'a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors.'" (quoting *Banknote Corp.*, 56 Fed. Cl. at 387)); *Forestry Surv. & Data v. United States*, 44 Fed. Cl. 493, 499 (1999) (noting agencies possess "great discretion in determining the scope of an evaluation factor").

        In arguing using two subcontractors "does not pose a risk to performance," plaintiff asks the Court to disagree with NARA's technical conclusion that two contractors would pose a risk to performance which runs afoul of the principle, "a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs.*, 463 U.S. at 43; *see E.W. Bliss Co.*, 77 F.3d at 449; Pl.'s MJAR at 18.  In its consensus evaluation, NARA explained the significance of switchgear and transformer work, noting the "[e]lectrical system is the most important system within any facility because it provides power supply to all other building equipment and systems."  Remand AR at 4961 (Consensus Evaluation).  LB&B's proposal noted [XXXXXXXXXXXXXX] is NARA's "[pr]eferred subcontractor," AR at 2880, and, per NARA, "[XXXXXXXXXXXXXX] has been providing much more professional service with higher quality of workmanship than [XXXX]."  Remand AR at 4961–62 (Consensus Evaluation).  Accordingly, NARA's decision to assign LB&B a weakness for its proposed use of two subcontractors, only one of which was NARA's preferred subcontractor, constitutes "rational reasoning and consideration of relevant factors."  *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc.*, 419 U.S. at 285).  Given the importance of switchgear and transformer work and the agency's explanation for assigning LB&B a weakness for proposing two subcontractors, the Court finds NARA's evaluation was not arbitrary and capricious and plaintiff's claims constitute "mere disagreements" with NARA's evaluation.  AR at 78 (RFQ); Remand AR at 4961–62 (Consensus

Evaluation); *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc.*, 419 U.S. at 285); *Motor Vehicle Mfrs.*, 463 U.S. at 43; *see E.W. Bliss Co.*, 77 F.3d at 449.

## 2. Past Performance

Plaintiff argues NARA irrationally assigned a weakness for "isolated personnel incidents" and for NARA's concern about "LB&B's ability to address conduct and behavioral issues among its employees." Pl.'s MJAR at 20–23. Plaintiff notes, "[t]hese weaknesses are unsupported by the Re[mand] AR and the relevant facts, are not reflected in NARA's evaluations of LB&B's work, and signal an arbitrary change of position by NARA."[2]  *Id.* at 20–21. Plaintiff notes the agency's reevaluation was irrational in this respect as "NARA appears to be punishing LB&B for unavoidable and infrequent examples of employee misconduct." *Id.* at 23. Plaintiff also argues NARA irrationally assigned a weakness for the failure of the central plant Tridium BAS and Chiller2a. *Id.* at 23–24. Plaintiff further argues Mr. Edwards' 2021 past performance questionnaire ("PPQ") contradicts NARA's assessment of past performance weaknesses, including:  isolated personnel incidents; time taken to backfill positions; and failure of the central plant Tridium BAS and Chiller2a. Pl.'s Reply Def.'s MJAR at 15 (citing AR at 2454–56).

The government responds:  the RFQ unambiguously stated NARA would consider a variety of sources when evaluating past performance, AR at 216; the agency may consider problems on the contract even when the contractor has addressed the problems via corrective action; "[g]iven the great deference agencies receive when evaluating the scope of an evaluation factor, LB&B cannot meaningfully contend backfilling positions and dealing with personnel issues are not encompassed within past performance"; "it was NARA's perception that LB&B let the Tridium BAS fail"; and "the chiller-2 failed shortly after LB&B and its subcontractor began working on it, which demonstrated to NARA that LB&B had not selected the proper subcontractor for the job and failures in LB&B's quality control plan." Def.'s MTD & Cross-MJAR at 26–29.

The RFQ delineates the extent to which an evaluator may use past performance of a vendor when evaluating a proposal. AR at 216. While the RFQ does not expressly provide evaluators may use their personal knowledge, the RFQ provides several sources evaluators may consider, and this list begins with "including, but not limited to," denoting the list is non-exhaustive. *Id.* The Federal Circuit has explained it would be "nonsensical" to require "experts to forget their expertise when evaluating a proposal." *Andersen Consulting*, 959 F.2d at 934 n.1. This court has also found, "[d]rawing upon personal knowledge to evaluate past performance is permissible." *Pitney Bowes Gov't Sols., Inc. v. United States*, 94 Fed. Cl. 1, 14 (2010) (first citing *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 568 (2000), and then citing *Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 842 n.54 (1999)). This court has held "it was proper for one evaluator with 'direct knowledge' of an offeror's past performance to downgrade his evaluation score based on that knowledge." *Pitney Bowes Gov't Sols., Inc.*, 94 Fed. Cl. at 14 (quoting *Labat-Anderson*, 42 Fed. Cl. at 842 n.54). Such is the double-edged sword of incumbency. During oral argument, plaintiff admitted the RFQ did not bar evaluators

---

[2] To the extent plaintiff is arguing the agency arbitrarily changed its initial evaluation during the re-evaluation, plaintiff later admits, "LB&B does not rely on the differences between the evaluation and the [r]eevaluation, nor does LB&B attack the decision to reevaluate." Pl.'s Reply Def.'s MJAR at 7.

from relying on personal knowledge.  *See* Tr. at 46:2–6 (plaintiff responded "No, Your Honor, I don't" to the Court asking "are you arguing that the RFQ bars the agency from relying on personal knowledge?").  Therefore, expecting NARA's evaluators "to forget their expertise when evaluating a proposal is nonsensical."  *Andersen Consulting*, 959 F.2d at 934 n.1.

Regarding plaintiff's primary argument the consensus evaluation contradicted Mr. Edwards' 2021 PPQ, during oral argument plaintiff admitted the evaluation team gave LB&B a strength for receiving all fives on the PPQ and plaintiff agreed, "to that extent," "the consensus evaluation is consistent with the PPQ."  Tr. at 127:13–18; Remand AR at 4874 (LB&B's Consensus Evaluation).  Plaintiff also agreed, "it [is] fair to say that the consensus evaluation just adds to Mr. Edwards' PPQ."  Tr. at 127:19–21.  Notably, as Mr. Edwards was a member of the evaluation team, indeed the Chairperson, the consensus evaluation includes his input, which undercuts plaintiff's argument the Court should only rely on Mr. Edwards' individual evaluation.  Remand AR at 4924.  By conceding the consensus evaluation only adds to Mr. Edwards' 2021 PPQ, plaintiff essentially concedes the consensus evaluation does not contradict the PPQ.  Tr. at 127:19–21.

In regard to general requirements for facilities management, the RFQ provides in relevant part:  "The Vendor must provide all program management, engineering, and services required to operate and maintain both facilities."  AR at 20.  Under "Personnel," the RFQ provides, "The Vendor will be responsible for identifying and assigning sufficient personnel as necessary to accomplish timely completion of all the requirements in the PWS, including management, supervision, [and] administration."  AR at 21.  Given the RFQ is for services and the vendor must provide necessary personnel, the Court agrees with the government's argument, "an offeror's ability to fill positions is necessarily an element of quality control and to accomplishing the goals of the work."  Def.'s MTD & Cross-MJAR at 28; *see Domenico Garufi*, 238 F.3d at 1332 (contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process").  Although the RFQ does not specify a particular time frame within which vacant positions must be filled, as this is a contract for CFM services, and since "a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors[,]" the Court finds backfilling positions "is intrinsic to the stated factors" in the RFQ.  *NEQ*, 88 Fed. Cl. at 48 (quoting *Banknote Corp.*, 56 Fed. Cl. at 387); *Forestry Surveys and Data*, 44 Fed. Cl. at 499 (noting agencies possess "great discretion in determining the scope of an evaluation factor").

NARA's evaluation team assigned LB&B the following personnel weakness under "Relevant Past Performance":  "NARA has concerns with LB&B's extended time period to back fill vacancies, often greater than two months.  NARA has concerns with LB&B's ability to address conduct and behavioral issues . . . ."  Remand AR at 4963 (Consensus Evaluation). Plaintiff claims LB&B failed to backfill some vacant positions partially due to the COVID-19 pandemic.  Pl.'s MJAR at 21.  Plaintiff also claims it was difficult to backfill certain positions "given the impending turn-over of the Task Order . . . there is no guarantee of long-term employment."  *Id.*  Notably, plaintiff does not dispute facts underlying what the government notes as personnel issues and issues backfilling positions.  Tr. at 82:12–18 ("It's undisputed [certain personnel issues and issues backfilling positions] occurred."); *see* Def.'s Reply at 16–17 ("Prior to COVID, LB&B had failed to fill other positions on time, including plumber positions,

electrician positions, Chief of Operating Engineer, and Chief Quality Control Specialist."). Since NARA's evaluators "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process," the evaluators were free to consider LB&B's inability to backfill positions. *Domenico Garufi*, 238 F.3d at 1332. Accordingly, NARA's consideration of LB&B's inability to fill certain positions and LB&B's failure to address in its proposal how it would remedy this going forward constitutes "rational reasoning and consideration of relevant factors," so "[this] reviewing court [is required] to sustain [the] agency['s] action." Remand AR at 4963 (Consensus Evaluation); *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc.*, 419 U.S. at 285); *see Motor Vehicle Mfrs.*, 463 U.S. at 43; *E.W. Bliss Co.*, 77 F.3d at 449.

For plaintiff's past services on Chiller2a, NARA explains why it assigned LB&B a weakness: "[A] foreign object . . . was found inside [Chiller2a] after a catastrophic failure, resulting in hundreds of thousands of dollars in repair. This is a failure of the Quality Control program. Mitigation measures needed to prevent this from reoccurring were not adequately explained in [LB&B's proposal]." Remand AR at 4960 (Consensus Evaluation). Regarding the Tridium BAS, the evaluation team stated: "The premature failure of the central plant Tridium BAS and subsequent discovery of a number of devices that were malfunctioning (current transformers and relays) . . . ha[s] cost NARA a considerable amount of funds that had to be diverted from other projects." *Id.* at 4964 (Consensus Evaluation). NARA adds: "Overall past performance of the chiller plant has been a concern for NARA. . . . [This r]aises concern to LB&B's overall approach to the operations and maintenance of critical equipment/systems at NARA." *Id.*

Although plaintiff argues, "responsibility for the [Chiller2a] leak has not been traced to any action or inaction by LB&B," Pl.'s MJAR at 24, plaintiff admits "LB&B oversaw [the maintenance] contractor and was in charge of the maintenance and upkeep," Tr. at 89:21–23. During oral argument, plaintiff admitted "the O&M contractor was responsible for all facility maintenance, so that would include the chillers as well." Tr. at 89:7–9; *see also* AR at 65 (providing the vendor must maintain chillers) (RFQ). This lends support to the government's argument "it was NARA's perception that LB&B let the Tridium BAS fail," and "the chiller-2 failed shortly after LB&B and its subcontractor began working on it, which demonstrated to NARA that LB&B had not selected the proper subcontractor for the job and failures in LB&B's quality control plan." Def.'s MTD & Cross-MJAR at 26–29.[3] During oral argument, plaintiff admitted, evaluating the past performance of these systems "certainly would have been [NARA's] prerogative." Tr. at 91:8–18; Tr. at 138:19–23 ("THE COURT: . . . So it was rational for NARA to consider LB&B's negative past performance. [PLAINTIFF]: To the extent there was negative past performance, that would have been reasonable for the agency to consider that."). NARA's technical determination of these system's failures constitutes a "discretionary determination[] of procurement officials that a court will not second guess." *E.W. Bliss Co.*, 77

---

[3] Although plaintiff argues it was "improper for NARA to assess a weakness based off the failure of the Tridium BAS that occurred over five years ago while NARA only had up to five years of past performance information for the non-incumbent vendors," plaintiff does not offer evidence to support this other than counsel's argument. Pl.'s Reply Def.'s MJAR at 17. The government notes the AR does not provide when the BAS failed, but the government submitted it did fail within the five-year performance period as "[t]he Tridium BAS failed in August 2020." Tr. at 12:4–20.

F.3d at 449.  Considering the BAS and chiller failed under LB&B's control, the agency's rational reasoning for assigning this weakness "requires [this] reviewing court to sustain [the] agency['s] action." *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc.*, 419 U.S. at 285); *CSC Gov't Sols.*, 129 Fed. Cl. at 434; *KSC Boss Alliance LLC*, 142 Fed. Cl. at 381 (explaining the Court "gives the greatest deference possible to [technical] determinations" (citations omitted); *see also Beta Analytics Int'l, Inc.*, 67 Fed. Cl. at 395.

### 3.  Irrigation Practices

Plaintiff further argues NARA arbitrarily and capriciously assigned a weakness for LB&B's irrigation practices as the incumbent.  Pl.'s MJAR at 25–27.  Plaintiff states, "the RFQ does not mention the WeatherTrak system, only that the facilities have 'irrigation systems,' and specifically calls for hand watering."[4]  Pl.'s MJAR at 25 (citing AR at 93 (RFQ)).  Plaintiff continues, "the WeatherTrak system is operational, . . . . [h]owever, the WeatherTrak program uses more water than necessary."  Pl.'s MJAR at 26.  "Consequently, and with NARA's full knowledge," plaintiff states LB&B "decided to utilize timers rather than WeatherTrak's purportedly 'smart technology,' to save millions of gallons of water," and "NARA has never complained about compromised landscaping due to improper watering."  Pl.'s MJAR at 26.

The government argues the evaluation team "knew [LB&B's] representation about [their irrigation] practices was misleading" and "the agency . . . possesses the discretion to consider extrinsic information or information that is personally known to an evaluator, particularly when the information demonstrates that an offeror 'cannot perform in the way it offered.'"  Def.'s MTD & Cross-MJAR at 30–31 (citations omitted).  The government adds, "[i]ndeed, it would be unfair to EMCOR and the other offerors if NARA had credited LB&B for its proposal to use WeatherTrak despite its knowledge that the system had been inoperable for two years."  Def.'s MTD & Cross-MJAR at 31.  "Contrary to LB&B's assertions in its reply . . . NARA rationally concluded that LB&B's misrepresentations about its use of the WeatherTrak system would pose a risk of unsuccessful performance."  Def.'s Reply Cross-MJAR at 18.

On plaintiff's argument "the RFQ . . . specifically calls for hand watering," the relevant RFQ provision states:  "Hand watering . . . or manually operating an irrigation system *may be required* anytime for *purposes such as* watering isolated spots, watering-in fertilizer, watering areas where there is insufficient coverage, areas where the irrigation system is malfunctioning, new sod, etc."  AR at 93 (RFQ) (emphasis added).  The RFQ also states "[t]he Vendor must ensure that the systems are in good working and repairable condition at all times."  AR at 96.  According to the RFQ, the irrigation system should be used except in certain circumstances, such as "where there is insufficient coverage."  AR at 93.  Plaintiff, however, states "with NARA's full knowledge, LB&B decided to utilize timers rather than WeatherTrak's purportedly 'smart technology.'"  Pl.'s MJAR at 25–26 (citing AR at 93).  Plaintiff thus admits its practice deviates from the RFQ as LB&B consistently "decided to utilize timers rather than WeatherTrak's purportedly 'smart technology.'"  Pl.'s MJAR at 26.

---

[4] Although plaintiff argues the RFQ does not mention the WeatherTrak system, during oral argument, the government clarified the phrase "irrigation systems" is synonymous with WeatherTrak system, Tr. at 101:10–12, and LB&B shows it understood the synonymity of these terms by proposing "LB&B utilizes NARA's WeatherTrak controller smart watering technology," AR at 2167 (LB&B's Proposal).

As LB&B's irrigation practice deviates from the RFQ, NARA explains it found LB&B's proposal misleading and accordingly assigned a weakness. *See* Remand AR at 4956–57 (Consensus Evaluation). For irrigation, plaintiff proposed: "At Archives I and II, LB&B utilizes NARA's WeatherTrak controller smart watering technology which turns the irrigation system on to keep the lawns and planting beds looking optimal. We manage this system and when there are issues with it, we provide manual overrides and water the grounds by hand." AR at 2167 (LB&B's Proposal). In its consensus evaluation, NARA explained: "LB&B's quote represents that they currently use and support WeatherTrak system as support for their technical capability, however, the WeatherTrak system has been inoperable for about two years. LB&B's failure to accurately describe the current situation in their quote calls in question their technical capability in this area." Remand AR at 4956–57 (Consensus Evaluation). Rather than showing NARA's consensus evaluation was arbitrary and capricious, plaintiff admits its current practice of "decid[ing] to utilize timers rather than WeatherTrak[]" contradicts its quote, "LB&B utilizes NARA's WeatherTrak [system]." Pl.'s MJAR at 25–26 (citing AR at 93); AR at 2167 (LB&B's Proposal). LB&B's contradiction thus supports NARA's explanation for assigning LB&B a weakness for "failure to accurately describe the current situation." Remand AR at 4957 (Consensus Evaluation); *Ala. Aircraft Indus.*, 586 F.3d at 1375 (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

If, as plaintiff argues, there was an issue with the irrigation system during LB&B's tenure, LB&B, as the incumbent vendor, was responsible for maintaining the system under the RFQ instead of manually overriding it. AR at 96–97 (RFQ) ("The Vendor must provide maintenance to keep all irrigation systems in proper working order . . . ."); *see* Remand AR at 4956–57 (Consensus Evaluation) (". . . LB&B did not employ a subcontractor to support the WeatherTrak system which resulted in its failure."). NARA added: "As of July 2021, LB&B has been operating the Archives II's irrigation system by hand for over 2 years." Remand AR at 4956 (Consensus Evaluation). During oral argument, the government noted, "LB&B's representation that this is wrong is just arguments of counsel [because plaintiff has not] submitted anything, other than their briefs, to say the agency's statement was wrong." Tr. at 105:9–19. Rather than disputing the issues with the WeatherTrak system, plaintiff argues LB&B deviated from the RFQ by not using WeatherTrak because "the WeatherTrak program uses more water than necessary." Pl.'s MJAR at 25–26 (citing AR at 93). This argument, however, is at odds with the RFQ and so rather than showing NARA's decision was arbitrary and capricious, plaintiff asks the Court to conclude LB&B's method is better than NARA's RFQ, which improperly asks the Court "to substitute its judgment for that of the agency." *Motor Vehicle Mfrs.*, 463 U.S. at 43; *see Ala. Aircraft Indus.*, 586 F.3d at 1375 (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43); *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc.*, 419 U.S. at 285).

## B. Whether NARA's Reevaluation of EMCOR's Quotation was Rational

Plaintiff argues NARA's evaluation of defendant-intervenor's proposal was irrational, unlawful, arbitrary, and inconsistent with the RFQ terms. Second Am. Compl. at 46–51. Plaintiff argues: "NARA arbitrarily assigned EMCOR's quotation strengths that it . . . should not have received . . . and failed to assess several weaknesses against EMCOR." *Id.* at 47.

"Specifically, NARA arbitrarily assigned strengths to EMCOR with respect to its experience: (1) demonstrating support for large-scale food services groups, and (2) performing O&M services for Archives I and II under a prior task order." Pl.'s MJAR at 27–28. According to plaintiff, "[a]dditionally, NARA should have assessed weaknesses against EMCOR because: (1) the majority of key personnel EMCOR proposed are not currently EMCOR employees, and EMCOR failed to secure subcontractors experienced with NARA's EMCS—Tridium or Automated Logic; and (2) EMCOR failed to propose maintenance protocols for the solar system at Archives II." *Id.* at 28.

## 1. Food Services

For food services, plaintiff argues, "the scale of the services that EMCOR provided to [XXXXXXXXXXXXXXXXX] and the Defense Commissary Agency is not apparent from EMCOR's quotation, and therefore neither is NARA's basis for awarding this strength." Pl.'s MJAR at 28. The government responds, "[i]n its proposal, EMCOR explained it would meet or exceed the requirements of the RFQ, and provided examples of instances when it had performed this service." Def.'s Cross-MJAR at 17 (citing AR at 1696). The government argues, "[a]lthough LB&B may disagree with that strength, its 'mere disagreement' does not meet its burden of demonstrating that NARA acted unreasonably." *Id.* at 17–18 (citation omitted).

EMCOR states its food service experience "includes services to food service equipment through [XXXXXXXXXXXXXXXXX] and the Defense Commissary Agency." AR at 1696 (EMCOR's proposal); *see also* AR at 1879, 1883, 1885, 1887 (EMCOR's proposal) (detailing EMCOR's food service experience). Per the consensus evaluation, NARA awarded EMCOR a strength because "EMCOR demonstrates support for large scale food service groups such as [XXXXXXXXXXXXXXXXX], HHS, Dulles Discovery Center, Defense Commissary Agency and Saint Elizabeths Hospital." Remand AR at 4857. As the RFQ provides, "[t]he Vendor must provide inspection, maintenance, and repair services for miscellaneous and non-GFE equipment located in the cafeteria and laboratories in the Archives I and II facilities," AR at 90, NARA's consideration of EMCOR's food services technical experience constitutes "consideration of [a] relevant factor[]." *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc.*, 419 U.S. at 285). NARA's explanation for assigning EMCOR a strength because EMCOR listed specific examples of experience providing food services at other facilities suffices for "rational reasoning." *Id.* Plaintiff did not show NARA "entirely failed to consider an important aspect of the problem," nor did plaintiff show NARA offered "an explanation for its decision that runs counter to the evidence before the agency" when NARA awarded EMCOR a strength for food services based on the information EMCOR provided in its proposal. *Ala. Aircraft Indus.*, 586 F.3d at 1375 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). Accordingly, plaintiff's claim "the scale of the services that EMCOR provided to [XXXXXXXXXXXXXXXXX] and the Defense Commissary Agency is not apparent from EMCOR's quotation, and therefore neither is NARA's basis for awarding this strength," Pl.'s MJAR at 28, constitutes mere disagreement with NARA's technical determination and is insufficient to carry plaintiff's burden of showing the agency's decision was arbitrary and capricious. *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc.*, 419 U.S. at 285); *E.W. Bliss Co.*, 77 F.3d at 449. As NARA's "action evince[ed] rational reasoning and consideration of relevant factors," the Court is required to sustain the agency's action. *Id.* Further, plaintiff's disagreement with NARA assigning

EMCOR a strength for food services improperly asks the Court to "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

### 2. Past Performance

Plaintiff argues NARA "improperly assigned EMCOR a strength for performing 'O&M services for NARA at A[rchives] II and A[rchives] I for 7 y[ears] under previous CFM contracts.'" Pl.'s MJAR at 29–30 (citing Remand AR at 4963). Plaintiff states, "NARA awarded EMCOR and LB&B equivalent strengths for providing past services to NARA though EMCOR was only [briefly] associated with [the previous CFM contractor] . . . 16 years ago . . . ." *Id.* at 30. Plaintiff adds, "there is no information in the Re[mand] AR to suggest that [the previous contractor] performed those services well or that EMCOR's quotation is technically stronger for that experience, and [the previous contractor] lost the re-award to LB&B." *Id.* Plaintiff continues, "[i]n contrast, LB&B has been performing this work for the last 16 years with top ratings from NARA." *Id.*

Plaintiff argues NARA "improperly assigned EMCOR a strength for performing O&M services for NARA," *id.* at 29–30; however, the RFQ allows the evaluation team broad discretion to evaluate various past performance sources. Specifically, NARA "may consider past performance information from various sources *including but not limited to* [several sources]." AR at 216 (emphasis added). Given the broad scope of past performance sources NARA may consider, NARA was within its authority to award EMCOR a strength for its past performance at NARA's facilities. AR at 216. Although plaintiff argues EMCOR performed these services only briefly and long ago, the RFQ does not limit evaluators to only recent or long-tenured past performance. *See id.* Lacking such a threshold, the evaluation team could use their technical expertise to determine whether a vendor's past performance merits a strength or weakness. *E.W. Bliss Co.*, 77 F.3d at 449. NARA's consideration of EMCOR's past performance at NARA accordingly constitutes "consideration of [a] relevant factor[]." *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc.*, 419 U.S. at 285).

NARA awarded EMCOR a strength because EMCOR "[p]erformed O&M services for NARA at A[rchives] II and A[rchives] I for 7 y[ea]rs under previous CFM contracts." Remand AR at 4864 (Consensus Evaluation Relevant Past Performance). NARA bases this evaluation on the information provided in EMCOR's proposal explaining its experience at NARA, which "ensure[s] a successful and rapid transition to full performance." AR at 1782 (EMCOR's Proposal). Plaintiff does not show NARA "entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency . . . ." *Ala. Aircraft Indus.*, 586 F.3d at 1375. The arbitrary and capricious standard is highly deferential, so the Court defers to NARA's decision to assess EMCOR a strength for past performance given EMCOR's experience at NARA. AR at 1781–82 (EMCOR's Proposal); *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc.*, 419 U.S. at 285). Plaintiff's claim LB&B's past performance is better than EMCOR's improperly asks the Court to "substitute its judgment for that of the agency" and has no bearing on whether NARA could validly award EMCOR a strength for its past performance. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Accordingly, plaintiff fails to carry its burden of showing NARA's decision was arbitrary and capricious. *Id.*; *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc.*, 419 U.S. at 285).

### 3. Solar Panel Maintenance

Plaintiff argues, "EMCOR was *the only vendor* that did not reference, let alone propose maintenance procedures for the solar panels." Pl.'s MJAR at 32 (first citing AR at 669 ([XXX]), then citing AR at 1228 ([XXXXXXXX]), and then citing AR at 2059, 2452–53 (LB&B)). Plaintiff asserts, "NARA therefore disregarded the requirements of the RFQ and irrationally and arbitrarily failed to assign EMCOR a weakness for failure to propose a methodology for solar panel maintenance . . . ." *Id.* at 33. The government responds: "EMCOR explained that it would 'maintain, repair, and service electrical generation systems.' Systems involving solar energy are part of the 'electrical generation systems.'" Def.'s Cross-MJAR at 20 (citing AR at 1690). "Consequently, NARA was satisfied from EMCOR's proposal that it would assume responsibility for all 'electrical generation systems,' including solar." *Id.* The government adds, "NARA's evaluators did not assess a strength or weakness to *any* vendor related to solar energy systems," and concluded LB&B's "mere disagreement is not a basis for setting aside NARA's rational evaluation." *Id.* (citation omitted).

The RFQ states the "CFM contractor is responsible for maintaining all solar systems at A[rchives] 2. This CFM contractor is also responsible for cleaning all solar panels at both facilities (A[rchives] 1 and A[rchives] 2)." AR at 621 (RFQ Amendment 003). Furthermore, the RFQ states, "[t]he CFM services for each facility include, but are not limited to: facility and site program management, building and site systems operation and maintenance (including HVAC, electrical systems (including solar)[)] . . . ." AR at 21. The RFQ addresses solar panel maintenance as a subset of electrical systems and does not enumerate any requirement for a subcontractor trained in solar panel maintenance. *Id.* At oral argument, plaintiff agreed solar panel maintenance is a subset of electrical generation systems. Tr. at 119:9–12. Defendant-intervenor argues EMCOR addressed in its proposal the solar panel requirement by stating it would maintain, repair, and service electrical generation systems. AR at 1690 (EMCOR's Proposal). As plaintiff agrees solar systems are a subset of electrical systems and as EMCOR proposed to maintain the electrical systems, EMCOR's proposal satisfies the RFQ requirement and NARA's decision to not assign EMCOR a weakness was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Ala. Aircraft Indus.*, 586 F.3d at 1373 (citation omitted). Plaintiff's claim NARA failed to assess a weakness for not specifically mentioning solar panel maintenance is mere disagreement and insufficient to carry plaintiff's burden of showing the agency's decision was arbitrary and capricious. *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc.*, 419 U.S. at 285); *E.W. Bliss Co.*, 77 F.3d at 449.

### 4. Key Personnel and Subcontractors

Plaintiff argues NARA irrationally failed to assess a weakness against EMCOR for lack of key personnel on staff, and failure to propose a subcontractor familiar with Tridium or Automated Logic. Pl.'s MJAR at 30–33. Plaintiff states, "of the 16 key personnel listed in EMCOR's quotation . . . the only position which EMCOR presently employs is the chief operating engineer proposed for Archives I." *Id.* at 31 (citing AR at 1795–1862). Plaintiff states, "the absence of key personnel currently on EMCOR's staff poses an obvious risk, and it is

undeniable that EMCOR's staff would require substantial training during the critical phase-in and base years, thus increasing performance risk." *Id.* at 32 (citation omitted). Plaintiff notes: "EMCOR not only fails to propose a subcontractor experienced in Tridium and Automated Logic, but EMCOR's quotation does not even mention Tridium or Automated Logic." *Id.* at 32.

The government responds, "it is reasonably discernible from the evaluation that NARA was satisfied from EMCOR's quotation that it had proposed qualified personnel to fill the specified positions, and that, given EMCOR's overall broad base of relevant experience, NARA was not concerned about the number of key personnel currently on staff." Def.'s Reply at 12 (citing Remand AR at 4926–30 (VSR), 4943–50 (Consensus Evaluation)). The government adds, "[g]iven LB&B's refusal to make their employees available [for hire], NARA reasonably declined to assess EMCOR a weakness for the lack of on staff key personnel." Def.'s Cross-MJAR at 19 (citing *KSC Boss Alliance, LLC*, 142 Fed. Cl. at 380). To plaintiff's assertion the agency should have assigned EMCOR a weakness for failing to specify a subcontractor having experience with NARA's BAS or EMCS, the government argues, "the RFQ did not require vendors to name a specific system" and EMCOR stated it would support NARA with professional engineering resources which "satisfied the requirements of the RFQ and did not in the agency's judgment constitute a flaw in the proposal that increased the risk of unsuccessful performance." *Id.* at 18 (citations omitted).

The RFQ specifies in detail personnel requirements and management. AR at 22–49. It further lists and describes job titles, major duties, qualifications such as experience, and certifications for key personnel. AR at 23–47. The RFQ provides, "detailed resumes must be submitted to the [contracting officer] for approval prior to assignment of individuals to the Program Manager, Program Manager Assistant, and On-site Coordinators/Supervisors position." AR at 24. The RFQ accordingly does not require a vendor to have key personnel on staff, rather it only requires the submission of resumes for key personnel for approval by the contracting officer. AR at 24. At oral argument, the government argued since the RFQ "just required that [vendors] submit resumes with certain experience. It didn't require [key personnel] currently be on staff. So [to] the extent that LB&B disagrees, that's mere disagreement and not a basis for setting aside the agency's evaluation." Tr. at 123:4–9. Plaintiff conceded it would be abnormal for a non-incumbent vendor to have the necessary personnel on staff, and an incumbent would benefit from already having a workforce. Tr. at 121:14–18, 122:24–25, 123:1–2.

The RFQ also includes a list of key subcontractors. AR at 48. The RFQ requires certain subcontract personnel to be trained to handle EMCS systems and to possess a minimum of five years of field experience performing such work. *Id.* The RFQ further states, "[t]he vendor must operate, maintain, test, adjust, program, and repair the [EMCS] and components to maintain the Archives I and environment within specified limits." AR at 66 (RFQ). Although the RFQ specifies the current EMCS systems is Siemens Apogee Insight Tridium, it does not require personnel trained in this system. AR at 48 (RFQ). The RFQ therefore does not require personnel trained in a specific system, but only necessitates training in EMCS systems generally. AR at 66 (RFQ).

Since the RFQ does not require EMCOR to propose specific people for key positions or personnel trained in Tridium, as plaintiff alleges, plaintiff does not show NARA "failed to

consider an important aspect of the problem." *Ala. Aircraft Indus.*, 586 F.3d at 1375 (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). Absent showing NARA failed to adhere to the RFQ, plaintiff's claim improperly requests the Court "substitute its judgment for that of the agency." *Motor Vehicle Mfrs.*, 463 U.S. at 43. Given plaintiff fails to show NARA's decision to not assign weaknesses for failing to propose key personnel or personnel trained in Tridium, the "highly deferential" arbitrary and capricious standard accordingly requires this Court to "sustain [the] agency['s] action." *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc.*, 419 U.S. at 285).

### C. Whether NARA's Best Value Determination was Rational

Plaintiff next asserts NARA's best value decision lacked a rational basis. Second Am. Compl. at 51–53. Plaintiff argues: "given the numerous strengths of LB&B's quotation, the arbitrary and unreasonable allocation of weaknesses to LB&B's quotation and strengths to EMCOR's quotation, the cost savings presented by LB&B's proposal, as well as LB&B's strong knowledge . . . as the incumbent contractor, NARA's best value decision was [irrational]." Pl.'s MJAR at 36. The government responds, "as the agency explained in its evaluation, even if LB&B had received *no weaknesses*, the agency would have concluded that EMCOR presented the best value to the Government." Def.'s Cross-MJAR at 37. The government notes, "LB&B's objections to the agency's best value analysis . . . fail to grapple with the various aspects of EMCOR's proposal that the agency concluded made EMCOR qualitatively superior." *Id.* (citation omitted). Although plaintiff argues its price was lowest, the government notes, "EMCOR 'was the only vendor to provide a pool of funds for unforeseen recurring maintenance,' which NARA found significant particularly given the slight difference in price." *Id.* (quoting AR at 4930).

The vendor selection report explains: "This is a best value GSA schedule acquisition, wherein the Government is more concerned with obtaining superior technical performance or reduced risk than in making an award at the lowest overall cost to the Government." Remand AR at 4924. The report continues: "Best Value for this task order was determined based on the following technical evaluation factors, which were equal in importance, and when combined were more important than Price: 1) Technical Understanding and Approach; 2) Management and Quality Control; and 3) Relevant Past Performance." Remand AR at 4924.

Regarding technical understanding and approach, NARA found EMCOR superior to other vendors because: (1) "EMCOR's National Maximo program infrastructure offered significant benefit to NARA's ability to deploy the Computerized Maintenance Management System (CMMS) at any location,"[5] Remand AR at 4926; (2) "EMCOR owns an in-house Vertical Transportation (VT) Group and states it will visit NARA [facilities] annually to review any elevator changes in the future 'at no additional cost' to NARA," *id.* at 4927; (3) EMCOR proposes 40 hours of professional engineering services to perform site inspections, arc flash

---

[5] Maximo is the CMMS NARA uses which is integrated into every aspect of the facilities. *See* Remand AR at 4926–27 (VSR). Maximo provides information on every maintenance action on each system, equipment, and component within Archives I and II, including estimated and actual hours, parts, and materials. AR at 56 (RFQ). NARA requires vendors use and manage this system by stating, "[t]he vendor will provide personnel trained in the use of MAXIMO systems." AR at 138 (RFQ).

study reporting, annual electrical infrared scanning support, design services, project management services, and building automation software review, *id.*; and (4) EMCOR proposes to use local company-owned professional engineering services for maintenance, repair, planning, design, alteration, and/or energy and water conservation support and recommendations, *id.*

NARA also recognized LB&B's technical understanding and approach strengths: (1) "expansive and detailed A/V support," Remand AR at 4927; (2) familiarity with NARA's mission and the requirement for operations and maintenance to improve energy and water efficiency, *id.*; and (3) an understanding of LEED Green building Rating System and would provide support for LEED-Gold certification process for Archives II, *id.* at 4927–28. NARA also recognized LB&B's weaknesses; namely, despite having the WeatherTrak irrigational control system, it remained inoperable for two years and was controlled manually during LB&B's term. *Id.* at 4928. NARA assessed a weakness because LB&B did not accurately describe irrigation in its quotation and concluded this posed a risk to successful performance. *Id.*

NARA concluded EMCOR offered a superior management and quality control approach. Remand AR at 4928. NARA explained, "EMCOR proposes a complete and effective quality control plan (QCP) with an excellent training program, incentive program[,] and effective safety program." *Id.* NARA stated EMCOR's QCP would also provide NARA valuable information to make informed decisions for preventive, corrective, and continuous improvement actions. *Id.* EMCOR also proposed what NARA termed a strong transition plan as it "promotes timely decisions and minimizes risk." *Id.* By contrast, NARA assessed LB&B a weakness when it came to managing the electrical system, "the most important system within any facility." Remand AR at 4929. By proposing separate subcontractors to manage switchgears and transformers at Archives I and Archives II, LB&B failed to meet NARA's PWS which requires the same quality work for Archives I and II. *Id.*

NARA described both EMCOR's and LB&B's high-ranking relevant past performance. *Id.* Despite LB&B's experience at NARA facilities, NARA found LB&B had past performance weaknesses during its incumbency. *Id.* NARA stated it "had concerns with LB&B's extended time period to back fill vacancies, often greater than two months." *Id.* LB&B also had trouble addressing personnel behavioral issues. *Id.* Further, NARA described the failures of Tridium BAS and Chiller2a during LB&B's tenure which caused significant losses for NARA. *Id.*

LB&B proposed a lower price, [XXXXXXXXXXX], compared to EMCOR's quote for $90,501,590.24. Remand AR at 4930. According to NARA, however, if it chose LB&B, it would not realize these cost savings as the main difference between EMCOR's price and LB&B's was the cost of the [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXX]. *Id.* Given this cost disparity, NARA found a significant possibility the [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXX]. *Id.* EMCOR's quote also included [XXXXXXXXX] over five years for unforeseen maintenance expenses. *Id.* Plaintiff admitted this pool of funds is enough to nullify the price difference between LB&B and EMCOR. Tr. at 17:2 – 6 ("[PLAINTIFF]: Your Honor, I think if you took . . . EMCOR's pool of funds, I believe their prices would be essentially the same, maybe even EMCOR may perhaps be[] slightly lower."). Accordingly, NARA concluded

EMCOR provided the best overall value to the government, found EMCOR's higher price was justified, and "the Evaluation Team concluded that EMCOR . . . could perform the CFM services at Archives I and Archives II with little to no risk." Remand AR at 4930.

At oral argument plaintiff stated, "[NARA claiming EMCOR's] quotation was qua[l]itatively superior without any supporting evidence to demonstrate what [NARA] based that blanket summary statement on . . . is very much of a problem, because we believe that the best value determination was premised of flawed technical evaluations . . . ." Tr. at 130:10–17. Plaintiff accordingly bases its position on NARA's best value determinations on whether NARA arbitrarily assessed LB&B and EMCOR's strengths and weaknesses—a question the Court answered in the negative. *See supra* Sections IV.A.–B. Regarding plaintiff's better price argument, since this was a best value determination, NARA was "more concerned with obtaining superior technical performance or reduced risk than in making an award at the lowest overall cost to the Government." Remand AR at 4926 (Consensus Evaluation). NARA determined EMCOR's "quotation was . . . superior to other Vendor's quotations . . . because of its technical strengths." *Id.* NARA filled seven pages describing why it found EMCOR superior, including an explanation of why these factors outweighed the [XXXX] price difference. AR at 4924–30 (VSR). Given NARA's explanation relates to relevant RFQ requirements, the Court finds the highly deferential arbitrary and capricious standard "requires [this] reviewing court to sustain" NARA's action as it "evinc[ed] rational reasoning and consideration of relevant factors." *Advanced Data Concepts*, 216 F.3d at 1058; *Ala. Aircraft Indus.*, 586 F.3d at 1373. Plaintiff's claim NARA's best value determination is "without any supporting evidence" is contradicted by NARA's detailed reasoning in the vendor selection report and thus constitutes mere disagreement with NARA's evaluation which is insufficient to carry plaintiff's burden of showing the agency's decision was arbitrary and capricious. *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc.*, 419 U.S. at 285); *E.W. Bliss Co.*, 77 F.3d at 449.

### D. Whether NARA Treated Vendors Disparately

Plaintiff further asserts "NARA failed to fairly and equitably evaluate LB&B's and EMCOR's proposals, which resulted in an artificially high technical rating for EMCOR and an artificially low technical rating for LB&B." Pl.'s MJAR at 17. Plaintiff argues, "NARA's Re-Evaluation . . . failed to comply with applicable law because it reveals disparate treatment of the offerors." *Id.* The government argues Federal Circuit precedent bars LB&B's disparate treatment claims as "LB&B cannot demonstrate that its proposal was 'substantively indistinguishable' from EMCOR's proposal." Def.'s Cross-MJAR at 31–36 (citations omitted). The government argues plaintiff's following arguments fail to meet the "substantively indistinguishable" standard: NARA disparately assessed a weakness for LB&B's use of two subcontractors for switchgears and transformers without assessing a weakness for EMCOR's use of two subcontractors to semi-annually inspect the uninterrupted power supply; NARA disparately assessed a weakness to LB&B for hand watering when [XXXXXXXX] and EMCOR proposed hand watering in their landscaping approaches; NARA disparately treated LB&B's food service and childcare services evaluation. *Id.* at 32–36.

To prevail on an unequal treatment claim, a protestor "must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively

indistinguishable' or nearly identical from those contained in other proposals," or that "the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." *Off. Design Grp.*, 951 F.3d at 1372 (citing *Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017)). "If a protestor does not [meet this threshold], then the court should dismiss the claim. To allow otherwise would give a court free reign to second-guess the agency's discretionary determinations underlying its technical ratings." *Id.* at 1373.

### 1. Food and Childcare Services

Plaintiff claims NARA assessing a strength for EMCOR's food services "but not [a] strength to LB&B for childcare services if not for food services *and* childcare services . . . . constitutes textbook disparate treatment." Pl.'s MJAR at 29 (citation omitted). Plaintiff argues it "demonstrated in its quotation that it has more experience than EMCOR with food services equipment and childcare facilities—most recently as the incumbent vendor for this task order—[however,] it did not receive a strength in the [reevaluation]." *Id.* at 28–29 (noting where LB&B lists in its proposal experience servicing childcare facilities and food services equipment). Plaintiff's argument is twofold: (1) LB&B should have received a strength for childcare services because EMCOR received a strength for food services; and (2) LB&B should have received a strength for food services because EMCOR did and LB&B's experience equals or exceeds EMCOR's. *Id.*

The food services requirements under the RFQ are: "The Vendor is responsible for the repair and maintenance of all equipment used for . . . food services. Equipment must be maintained in accordance with the manufacturer recommendations. Specialized fire suppression systems or grease interceptors and any other systems used to support food services are . . . the vendor's responsibility." AR at 98 (RFQ). For childcare services, the RFQ states: "the CFM vendor is responsible for maintenance and housekeeping responsibilities in th[is] area[]." AR at 21 (RFQ). For food services, the RFQ primarily describes equipment maintenance, whereas for childcare services, the RFQ primarily describes housekeeping services. AR at 21, 98. The RFQ's requirements for food services and childcare services are unlike one another, so plaintiff's comparison of LB&B's proposal for childcare services to EMCOR's proposal for food services is apples to oranges. *Compare* AR at 98 (RFQ) (describing the vendor's responsibility of maintaining "equipment used for the commercial preparation of food services"), *with* AR at 118 (RFQ) (describing "cleaning services [which] must be performed for the Archives II Child Care Center"). In arguing NARA disparately treated LB&B by failing to assign it a strength for childcare services because NARA assigned EMCOR a strength for food services, plaintiff improperly compares its proposal for childcare services to EMCOR's proposal for food services. *Off. Design Grp.*, 951 F.3d at 1373. Not only are the RFQ requirements for food services and childcare services plainly different, but plaintiff also fails to show language in its proposal that is "substantively indistinguishable" from EMCOR's—thus, "the Court should dismiss th[is] claim." *Id.*

Regarding plaintiff's argument LB&B should have received a strength for food services because EMCOR did, plaintiff cites LB&B's experience of 16 years with food services equipment as the incumbent contractor for this task order and LB&B's 7 years of experience

servicing kitchen equipment at the Thomas F. Eagleton Courthouse.  Pl.'s MJAR at 28–29
(citing AR at 2469).  Plaintiff further claims:  "Since NARA relied on EMCOR's past
performance for kitchen equipment support, they should have done the same thing for LB&B.
So, they treated the two parties disparately."  Tr. at 111:13–16.  The government states LB&B
only mentioned its food services experience in its past performance proposal section.  Def.'s
Cross-MJAR at 34–35; *see* AR at 2469 (LB&B proposal).  The government notes, however,
"EMCOR explained [in its technical proposal] that it would meet or exceed the requirements
of the RFQ, and provided examples of instances when it had performed [food services]."  Def.'s
Cross-MJAR at 17 (citing AR at 1696); AR at 1696 ("[EMCOR's] experience also includes
services to food service equipment through [XXXXXXXXXXXXXXXX] and the Defense
Commissary Agency."); Remand AR at 4949 (Consensus Factor Evaluation Technical
Understanding and Approach) ("EMCOR demonstrates support for large scale food service
groups such as [XXXXXXXXXXXXXXXXX], HHS, Dulles Discovery Center, Defense
Commissary Agency and Saint Elizabeths Hospital." ).  EMCOR provided substance in its
technical proposal which LB&B's technical proposal lacked, and, as the government states,
plaintiff does not argue LB&B's proposal was "substantively indistinguishable" from EMCOR's.
[6]  Def.'s Cross-MJAR at 34–35; *see* Tr. at 115:8–13 (the government stated NARA awarded
LB&B a strength for food services in its past performance and not a technical strength because
"everything LB&B is citing is in its past performance volume and . . . [LB&B] did not . . .
highlight how it would meet . . . the requirements of the RFP in its technical volume," whereas
EMCOR did); Tr. at 117:17–21 ("[DEFENDANT-INTERVENOR]: . . . . So [EMCOR] list[ed]
five [food service] locations.  If you take out the three that are in the past performance, you still
have the two that are in the technical proposal. . . .  LB&B had zero in their technical proposal.").
As plaintiff fails to identify any language in its proposal is "substantively indistinguishable"
from EMCOR's, "the Court should dismiss th[is] claim."  *Off. Design Grp.*, 951 F.3d at 1373;
Tr. at 141:9–15 ("THE COURT:  Well, back to the [*Office Design*] standard, . . . I don't see in
your briefing . . . how your proposal and EMCOR's proposal are substantively
indistinguishable. . . .  [PLAINTIFF]:  Your Honor, I apologize.  I'm not sure I have an answer
for you for that.").[7]

---

[6] At oral argument, defendant-intervenor distinguished the nature of food service experience of LB&B and EMCOR
as "[EMCOR is] maintaining equipment, machinery, refrigerators . . . EMCOR supports th[e] equipment.  In
LB&B's proposal . . . [t]hey didn't talk about supporting equipment and having experience in their technical
[volume] . . . ."  Tr. at 116:1–12.

[7] Although the Court understands plaintiff's primary argument is disparate treatment, plaintiff also appears to argue,
though not explicitly, NARA acted in an arbitrary and capricious manner.  Plaintiff argues, given LB&B's "16 years
of experience with food services equipment as the incumbent vendor for Archives I and II[,] . . . NARA should have
either awarded both or neither EMCOR nor LB&B strengths for their experience with food services equipment."
Pl.'s Reply Def.'s MJAR at 23.  Plaintiff claims "it was therefore irrational for NARA to award a strength for
experience with maintenance of food services equipment but not childcare facilities" when "NARA assessed
strengths for experience in certain components of the CFM work solicited in the RFQ, then LB&B should have
received a strength for its notable experience with childcare facility maintenance."  *Id.* at 24.  Plaintiff's argument is
imprecise; nevertheless, the Court will briefly address the arbitrary and capricious standard here, in addition to
disparate treatment.  *See supra* Section IV.D.1.  To meet the arbitrary and capricious standard, plaintiff must argue
NARA's evaluation of LB&B's proposal was not based on parameters in the RFQ or that NARA provides "an
explanation for its decision that runs counter to the evidence before the agency."  *Ala. Aircraft Indus.*, 586 F.3d at
1375.  In the agency's consensus evaluation, NARA assigned LB&B a strength for past performance at NARA
because, "[i]n its past performance questionnaire, the NARA COR gave LB&B a '5', the highest rating for Overall

### 2. Electrical Systems

Plaintiff argues "LB&B received a weakness for proposing two subcontractors for electrical work while EMCOR did not, constitutes disparate treatment" because "EMCOR also proposed two subcontractors for semi-annual inspection of the Uninterrupted Power Supply ('UPS'), which is also an electrical system under Section 21 of the RFQ." Pl.'s MJAR at 20 (first citing AR at 1790; then citing *Sophion Bioscience, Inc. v. United States*, 154 Fed. Cl. 414, 422 (2021); and then citing *FFL Pro LLC v. United States*, 124 Fed. Cl. 536, 559–60 (2015)). Even though switchgears, transformers, and the uninterrupted power supply are all classified as electrical systems per the RFQ, these systems are different subcomponents of electrical. AR at 78 (RFQ). Also, as the government notes, uninterrupted power supplies are low voltage devices and are not as critical to the facilities as high voltage switchgears and transformers. Def.'s Cross-MJAR at 33–34; AR at 78 (RFQ). Plaintiff further admitted LB&B's and EMCOR's proposals for switchgear and transformer work are "substantively different." Tr. at 144:17–21 (THE COURT: . . . just with respect to switchgears and transformers . . . EMCOR proposes one vendor, LB&B proposes two. That's substantively different. [PLAINTIFF]: It is, yes."). In sum, these systems are distinct electrical subcomponents, unlike one another in terms of voltage and importance to the facility. AR at 78 (RFQ). Accordingly, plaintiff has not shown EMCOR's proposal of two vendors for uninterrupted power supplies is "substantively indistinguishable" from LB&B's proposal of two vendors for switchgear and transformer work; therefore, "the Court should dismiss th[is] claim." *Off. Design Grp.*, 951 F.3d at 1373.

### 3. LB&B's Past Performance

Plaintiff argues "NARA's consideration of [specific] personnel incidents . . . constituted disparate treatment of LB&B as the incumbent vendor." Pl.'s MJAR at 23. Plaintiff adds NARA's consideration of LB&B's past performance regarding the BAS system and Chiller2a also constituted disparate treatment because the agency only has this information due to LB&B's incumbency status. *Id.* at 24. The RFQ states: "Evaluation of past performance is not limited to information supplied by the vendor or on behalf of the vendor. The Government may consider past performance information from various sources." AR at 216 (RFQ). Furthermore,

---

Assessment on PPQ." Remand AR at 4963 (Consensus Factor Evaluation Relevant Past Performance). The evaluation also awards a strength for LB&B's relevant past performance at other agencies which NARA concludes "is extensive and representative of [NARA's] facilities." Remand AR at 4964 (Consensus Factor Evaluation Relevant Past Performance). On the other hand, NARA assigned EMCOR a technical strength because "EMCOR demonstrates support for large scale food service groups such as [XXXXXXXXXXXXXXXXXX], HHS, Dulles Discovery Center, Defense Commissary Agency and Saint Elizabeths Hospital." Remand AR at 4949 (Consensus Factor Evaluation Technical Understanding and Approach). NARA's past performance evaluation of LB&B included strengths for food and childcare services. *See* Tr. at 115:8–14. Plaintiff, however, did not mention these strengths in its technical proposal, so they were not awarded a technical strength; instead, the agency awarded LB&B a strength under relevant past performance. *See* Tr. at 114:22–25. Accordingly, plaintiff was awarded strengths for food and childcare services based on past performance and therefore has failed to show NARA "entirely failed to consider an important aspect of the problem." *Ala. Aircraft Indus.*, 586 F.3d at 1375. "The arbitrary and capricious standard applicable here is highly deferential" and therefore requires the Court "to sustain [NARA's] action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc.*, 419 U.S. at 285); *Ala. Aircraft Indus.*, 586 F.3d at 1375 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

considering negative past performance does not reveal improper treatment. *Andersen Consulting*, 959 F.2d at 934 n.1 (holding it would be "nonsensical" to require "experts [NARA] to forget their expertise when evaluating a proposal"); *Labat-Anderson*, 42 Fed. Cl. at 842 n.54 (finding it proper for an agency with "direct knowledge" of an offeror's past performance to downgrade its evaluation score based on that knowledge). At oral argument, plaintiff acknowledged NARA would evaluate incumbents differently from non-incumbent offerors, given the incumbent's past performance. Tr. at 146:2–7 ("THE COURT: But that's inherently different than considering the other offerors who were not incumbents. [PLAINTIFF]: That is correct, Your Honor. THE COURT: So isn't that substantively distinguishable? [PLAINTIFF]: I think it's substantively distinguishable, Your Honor . . . ."). Plaintiff also agreed NARA could "consider LB&B's good past performance and bad past performance." Tr. at 138:11–14; Tr. at 138:21–23 ("[PLAINTIFF]: To the extent there was negative past performance, [i]t would have been reasonable for the agency to consider that."). Thus LB&B cannot show its proposal is "substantively indistinguishable" from EMCOR's, which requires the Court to dismiss this claim for disparate treatment. *Off. Design Grp.*, 951 F.3d at 1373.

### 4. Irrigation Practices

Plaintiff claims "NARA assessed the vendors' quotations inconsistently," as EMCOR proposed hand watering but did not receive a weakness, unlike LB&B. Pl.'s MJAR at 26–27. Plaintiff also argues NARA disparately assigned EMCOR a strength for "its '[g]rounds and landscaping approach,' [AR at 4857], even though [EMCOR] states that it 'program[s] all watering to occur either before 10 am or after 5pm,' and 'supplements water schedules with hoses and gator bags (if permitted).'" Pl.'s MJAR at 27 (first quoting AR at 1700 (EMCOR's Proposal); and then citing AR at 1702 (EMCOR's Proposal)). The RFQ states, "[h]and watering using a large portable water tank, hose bib, hoses, or manually operating an irrigation system may be required [in limited circumstances]." AR at 93 (RFQ). Unlike LB&B's consistent manual override of the WeatherTrak system, EMCOR's proposal of hand watering where there is insufficient sprinkler coverage is consistent with the RFQ. *Compare* AR at 93 ("Hand watering . . . may be required . . . [to] water[] areas where there is insufficient sprinkler coverage."); *with* AR at 1700 (EMCOR's Proposal) ("Where vegetation is showing signs of stress, or in areas outside irrigation range, we supplement watering schedules with hoses and gator bags (if permitted)."), *and* Pl.'s MJAR at 26 (". . . LB&B decided to utilize timers rather than WeatherTrak's purportedly 'smart technology[]' . . . ."). LB&B's deviation from the RFQ and EMCOR's compliance with the RFQ shows their proposals are not "substantively indistinguishable." *Off. Design Grp.*, 951 F.3d at 1373. As LB&B fails to show its proposal was "substantively indistinguishable" from EMCOR's, "the Court should dismiss th[is] claim." *Id.*

### 5. Conclusion

Although plaintiff agreed *Office Design* provides the standard for disparate treatment, Tr. at 138:1–4, and plaintiff admitted its disparate treatment allegations involve NARA's "subjective technical determination[s]," Tr. at 141:21–22, plaintiff was unable to show the Court any "substantively indistinguishable" proposal language. Tr. at 140:18–22 ("THE COURT: . . . So show the Court language from your proposal and from EMCOR's proposal that you argue that i[s] substantively indistinguishable. [PLAINTIFF]: I don't know that I can do that, Your

Honor."). Plaintiff instead argues the proposals "have to be read . . . in their entirety," Tr. at 140:22–23; however, this is not the *Office Design* standard for disparate treatment which plaintiff agreed applies. Tr. at 138:1–4; *see Off. Design Grp.*, 951 F.3d 1373. The Court must deny plaintiff's various disparate treatment claims as plaintiff is unable to show LB&B's proposal was "substantively indistinguishable" from EMCOR's. *Off. Design Grp.*, 951 F.3d 1373; *see supra* Sections IV.D.1.–4. (finding a distinction between high voltage and low voltage devices, the RFQ permits NARA to consider LB&B's incumbent performance which non-incumbents lack, a distinction in watering services provided by LB&B and proposed by EMCOR, and a distinction between food services and childcare services); Tr. at 140:18–22.

### E.  Whether NARA's Procurement Process Prejudiced LB&B

Plaintiff argues "LB&B was prejudiced by NARA's irrational and unreasonable technical evaluations and best value determination." Pl.'s MJAR at 36 (citation omitted). Plaintiff continues:

> Because LB&B's quotation proposed the lowest price and a proper evaluation would have left LB&B with no or fewer weaknesses and additional strengths, and EMCOR with more weaknesses and fewer strengths . . . LB&B's quotation would have presented the best value. Therefore, LB&B would have had a substantial chance of being awarded the Task Order but for NARA's arbitrary actions.

*Id.* The government argues plaintiff cannot show prejudice as "NARA not only assessed more strengths to EMCOR than to LB&B[,] . . . but it also explained why certain strengths made EMCOR's proposal qualitatively superior." Def.'s Cross-MJAR at 15 (citing Remand AR at 4926–30, 4943–59), 15–17 (explaining NARA found EMCOR offered the best value as it provided the following strengths: Maximo capabilities; "Center of Excellence"; "proposing 40 hours of professional engineering services"; local company-owned professional engineering services; pool of funds for unforeseen maintenance expenses; and in-house "Vertical Transportation Group" (citing Remand AR at 4926–27 (VSR))); *see also supra* Section IV.C.

"To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data Gen. Corp v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). Rather, a bid protest plaintiff must establish alleged "errors in the procurement process significantly prejudiced [the plaintiff]" by showing "there was a 'substantial chance' it would have received the contract award but for the errors." *Bannum*, 404 F.3d at 1353 (quoting *Info. Tech. & Apps. Corp.*, 316 F.3d at 1319).

During oral argument, the government stated NARA would have awarded EMCOR the task order based on its strengths alone irrespective of any weaknesses assessed to LB&B. Tr. at 155:1–6; AR at 4930 ("EMCOR was the only vendor to provide a pool of funds for unforeseen recurring maintenance. The allowance provided by EMCOR, roughly [XXXXXXXXX] over five years, is significant, especially given the slight difference in overall quoted pricing between EMCOR and LB&B. . . . The Contracting Officer and Evaluation Team concluded that EMCOR . . . could perform the CFM services at Archives I and Archives II with little to no risk."). When asked if plaintiff challenged what NARA noted were EMCOR's key strengths,

plaintiff admitted "I don't think we specifically addressed that, Your Honor . . . ." Tr. at 150:11–12.  Plaintiff fails to explain why the strengths awarded to EMCOR are unreasonable and irrational, instead claiming NARA used "mere conclusory statements." Tr. at 150:13.  When asked if plaintiff argued this in their briefs, plaintiff stated, "[w]e did not argue that, Your Honor." Tr. at 150:18.  Plaintiff instead stated, "we believe the entire process was flawed [and] without a proper evaluation, we don't know if a side-by-side comparison would present EMCOR as the best value or not." Tr. at 152:15–18.

Since NARA based its decision solely on EMCOR's key strengths, plaintiff fails to show any meaningful "errors in the procurement process" by not challenging the key strengths NARA assigned to EMCOR.  *Bannum*, 404 F.3d at 1353 (quoting *Info. Tech. & Apps. Corp.*, 316 F.3d at 1319); *see* AR at 4930 (VSR) ("Given the benefits provided by EMCOR's quote, even if LB&B did not have any weaknesses, EMCOR would still provide the best value.").  Even if plaintiff showed NARA erred by assessing LB&B weaknesses, NARA based its award decision solely on EMCOR's strengths, so such an error would be harmless.  AR at 4930 (VSR); *see Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021) (finding "no departure from the correct legal standard" in the trial court's prejudice analysis when it declined to set aside an agency's award decision after concluding that eliminating an erroneously assessed strength would not have affected the agency's best value decision).  Accordingly, as plaintiff failed to show NARA erred in assigning LB&B weaknesses or EMCOR strengths, plaintiff cannot establish prejudice because it failed to establish "there was a 'substantial chance' it would have received the contract award but for the errors."  *Bannum*, 404 F.3d at 1353 (quoting *Info. Tech. & Apps. Corp.*, 316 F.3d at 1319); AR at 4930 (VSR).

## V.  Whether the Composition of NARA's Evaluation Team Resulted in an Unlawful and Biased Reevaluation

Plaintiff argues "the composition of NARA's Evaluation Team and its failure to follow the [Vendor Screening Plan ('VSP')] requirement for price-blind technical evaluations resulted in a biased Re-Evaluation and prejudicial violation of NARA's own procurement protocols."[8]  Pl.'s MJAR at 14–15 (first citing *Ernst & Young, LLP v. United States*, 136 Fed. Cl. 475, 512 (2018), and then citing *Innovative Test Asset Sols. LLC v. United States*, 125 Fed. Cl. 201, 224 (2016)).  Plaintiff argues, "[a] Court will scrutinize 'the composition and organization of the evaluation team' where there is 'evidence that the team members were inept, biased, or acted in bad faith.'"  *Id.* at 12 (quoting *Innovative Test Asset Sols. LLC*, 125 Fed. Cl. at 224).  Plaintiff asserts the evaluators knew "LB&B and EMCOR's price quotations were only [XXXX] apart, and . . . . [t]his knowledge resulted in bias toward EMCOR because NARA had already awarded the Task Order to EMCOR once, and EMCOR proposed [XXXXXXXXXXXXXXXXXXXX]."

---

[8] The government asserts it expressly stated NARA intended to conduct a new source selection decision upon remand, Def.'s Remand Mot. at 2, and "when an agency elects to take new action, as NARA did here, it 'is not limited to its prior reasons.'"  Def.'s Cross-MJAR at 12 (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1908 (2020)).  The government adds, "because it was an entirely new decision, the evaluators were under no obligation to explain differences between the first evaluation and the re-evaluation."  *Id.* (citations omitted).  Although plaintiff compares the reevaluation to the evaluation for "context," plaintiff replies by stating this issue is not in dispute.  Pl.'s Reply Def.'s MJAR at 7 ("LB&B does not rely on the differences between the evaluation and the Reevaluation, nor does LB&B attack the decision to reevaluate."); Tr. at 41:2–6 (plaintiff stating, "the purpose of [comparing the reevaluation with the initial evaluation] was to give context").

*Id.* at 13.  Plaintiff asserts, "NARA stated in the VSR for the Re-Evaluation that '[t]he [evaluation team] members each evaluated each quotation independently in accordance with the RFQ and Vendor Selection Plan.'"  *Id.* (citing Remand AR at 4925).

### A. The Government's Motion to Dismiss Arguments

The government states LB&B's arguments NARA failed to adhere to the VSP either fail to state a claim, or have been waived.  Def.'s Cross-MJAR at 8–12.  The government notes the VSP was not incorporated into the solicitation, adding:  "internal plans and other internal documents like the VSP are guidelines.  Thus, they do not confer any rights to offerors."  *Id.* at 9 (citations omitted).  The government adds, "both the SSA and the parties knew in advance that evaluation team might not conduct price-blind individual evaluations."  *Id.* at 10 (citing Compl. ¶ 85).  The government also argues LB&B knew of the agency's proposed corrective action, and "[w]]hen an offeror has notice of the agency's proposed corrective action, it cannot wait until after award to challenge that proposed corrective action."  *Id.* at 10–11 (citations omitted).  The government asserts, "LB&B also waived any right to challenge NARA's proposed corrective action because LB&B consented to [the government's motion for voluntary remand]."  *Id.* at 11.

The VSP spans Remand AR pages 4901 through 4909.  The VSP provides:  "Evaluators will initially evaluate only the technical factors . . . .  Vendor prices will be withheld to prevent any evaluation being biased due to price."  Remand AR at 4907 (VSP).  The VSP also provides the evaluation team will consist of the following members:  (1) Timothy Edwards—Chairperson; (2) John Bartell—Evaluator; and (3) Ngan Pham—Evaluator.  Remand AR at 4902 (VSP).

"Source selection plans do not afford any rights to offerors; instead, the text of the solicitation governs the procurement."  *Sigmatech, Inc. v. United States*, 136 Fed. Cl. 346, 351 (2018) (citing *Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 41 (2010), *aff'd on other grounds*, 649 F.3d 1320 (Fed. Cir. 2011)) ("[T]he Army's Source Selection Plan, marked 'FOR OFFICIAL USE ONLY,' was an internal Army document, 'provid[ing] the strategy for the source selection of this acquisition.'").  In *Allied Technology*, the court found, "DOJ's failure to follow the [Proposal Evaluation Plan] did not render its evaluation of [plaintiff]'s proposal arbitrary, capricious, or pretextual."  94 Fed. Cl. at 41.

As the government states, plaintiff omits "solicitation" from its citation of *Ernst & Young*, which clarifies the court was stating an agency's failure to follow its solicitation, not an internal plan, is a violation:  "An 'agency's failure to follow its own selection process embodied in the *[s]olicitation* is . . . a prejudicial violation of a procurement procedure established for the benefit of offerors.'"  *Ernst & Young, LLP*, 136 Fed. Cl. at 512 (quoting *Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 273, *modified*, 63 Fed. Cl. 141 (2004) (emphasis added)).  Notably, the VSP is not in the list of eleven enclosures sent to bidders with the RFQ, AR at 11 (RFQ), and as in *Sigmatech*, the VSP pages are labeled "FOR OFFICIAL USE ONLY," signaling the VSP is an internal document, Remand AR at 4901–07 (VSP).  "Unlike in *Ernst & Young* and *Hunt*, the VSP in this procurement was not incorporated into the solicitation," Def.'s Cross-MJAR at 10, but rather like *Manson*, plaintiff concedes:  "the [VSP] was not distributed to potential offerors as part of the [s]olicitation"; "plaintiff did not see the [VSP] until the filing of

the administrative record under seal"; and "the [VSP] was not incorporated into the [s]olicitation." *Manson Const. Co. v. United States*, 79 Fed. Cl. 16, 19 (2007); Tr. at 21:14–18 ("THE COURT: So, [plaintiff], when did [LB&B] first see the VSP? [PLAINTIFF]: That was a . . . part of the [AR], Your Honor, once the protest was filed.").

This court has found in some cases once a source selection authority ("SSA") approves a source selection plan, the SSA "should expect, unless informed to the contrary, that it has been followed." *USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 453–54 (2010). As the government notes, unlike FAR Part 15 procurements involving an SSA solely relying on a team of evaluators, unaware of whether each evaluator is following the plan absent contrary information, this was a FAR Part 8 procurement involving only three evaluators and an intimately involved SSA. *See id.* at 454 ("[The SSA] might believe, for instance, that a certain rating was produced by one formula, when in fact another formula was used by evaluators, creating a disconnect between his decision and the underlying facts."). In this regard, *USfalcon* and related FAR Part 15 cases are accordingly inapposite to this FAR Part 8 procurement. Tr. at 30:23–25 (plaintiff admitting *USfalcon* is a FAR Part 15 case).

Even if *USfalcon* applies to this FAR Part 8 procurement, *USFalcon* provides an exception: "the choice to depart [from the plan] must have been made known to [the SSA] so that it may receive at least implied approval." 92 Fed. Cl. at 454. "Any such suspicions [of bias or error] could be dispelled by records showing that the departure from the plan was consciously chosen prior to the viewing of proposals, or articulating a rational reason for the departure." *Id.* In this case, the SSA knew the reevaluation might not be price blind, as the government's motion to remand stated: "At this time, NARA is unsure whether it will use the evaluation team from the prior evaluation, whether it will add members to the prior evaluation team, or whether it will select new evaluation team members." Def.'s Remand Mot. at 2. Furthermore, the SSA knew the reevaluation was not price blind as the SSA signed the final vendor selection report which listed the same evaluation team as the original evaluation. AR at 4923–24 (VSR). Thus, it is reasonably discernible the SSA either expressly or impliedly approved using the same evaluation team for the reevaluation. *See USfalcon*, 92 Fed. Cl. at 454; AR at 4923–24 (VSR); Tr. at 36:5–8 (the government stated, "the evaluation team and contracting officer evaluated the prices. It's the identical evaluation team. [SSA] would have known she was dealing with the same people."). This case is thus unlike cases involving circumstances where the SSA might not have been aware of the evaluators' alleged deviations from the source plan. *See USfalcon*, 92 Fed. Cl. at 453–54. The Court accordingly finds plaintiff fails to state a claim upon which relief can be granted as to its Count I.A. because the SSA expressly or impliedly knew the reevaluation was not price blind. *See Sigmatech, Inc.*, 136 Fed. Cl. at 351 (citing *Allied Technology Group, Inc.*, 94 Fed. Cl. at 41); *USfalcon*, 92 Fed. Cl. at 453–54.[9]

---

[9] The government alternatively argues plaintiff waived its right to object to the reevaluation team composition and the fact that the reevaluation was not price blind. Def.'s Cross-MJAR at 10–11 (citing *Sonoran Tech. & Pro. Servs., LLC v. United States*, 135 Fed. Cl. 28, 35 (2017), and then citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313–15 (Fed. Cir. 2007)). The government also argues plaintiff consented to the possibility of a non-price blind evaluation and the composition of the evaluation team generally. Def.'s Cross-MJAR at 11–12. Although the motion stated, "NARA [might] use the evaluation team from the prior evaluation," "LB&B did not oppose the motion." Def.'s Remand Mot. at 1–2. LB&B failed to raise its objection to the reevaluation procedure until after the reevaluation despite knowing it might proceed exactly as it did. Tr. at 159:18–21 ("[PLAINTIFF]: We did not

### B.  The Government's Merits Arguments

In addition to moving to dismiss plaintiff's claim on the reevaluation team composition, the government argues plaintiff's claim fails on the merits.  Def.'s Cross-MJAR at 8.  The government asserts, "LB&B has failed to present *any* evidence supporting [its claim the agency's evaluators demonstrated bias or acted in bad faith], much less the hard facts that this Court's precedent requires."  Def.'s Cross-MJAR at 6–7.  The government adds, "LB&B . . . merely disagrees with NARA's technical evaluation, which is 'not sufficient to satisfy a threshold showing either of motivation for a Government employee to have acted in bad faith or of conduct that is hard to explain absent bad faith.'"  Def.'s Cross-MJAR at 13 (citations omitted).  The government adds, "in the only case that LB&B cites in support of this point, *Innovative Test Asset Solutions, LLC v. United States*, 125 Fed. Cl. 201, 224 (2016), the Court declined to question the composition of the evaluation team because the protestor—like LB&B—lacked evidence to support its allegations."  Def.'s Cross-MJAR at 13–14.

"Government officials are presumed to carry out their duties in good faith."  *Spezzaferro v. F.A.A.*, 807 F.2d 169, 173 (Fed. Cir. 1986).  "It takes 'well-nigh irrefragable proof' [of bias or bad faith] to overcome the presumption."  *Sanders v. U.S. Postal Serv.*, 801 F.2d 1328, 1331 (Fed. Cir. 1986) (citations omitted).  When a protestor alleges bad faith or bias "the proof must be almost irrefragable," which amounts to "clear and convincing evidence" of a "specific intent to injure the plaintiff."  *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (citations omitted).

The VSP provides:  "Evaluators will initially evaluate only the technical factors . . . .  Vendor prices will be withheld to prevent any evaluation being biased due to price."  Remand AR at 4907 (VSP).  Notably, the VSP does not mention a price-blind *reevaluation*.  *Id.*

---

object [before reevaluation to NARA using the same evaluation team]."). Plaintiff knew *before* the reevaluation it might not be price blind, and so plaintiff should have raised its objections then. *See* Def.'s Remand Mot. at 2 ("At this time, NARA is unsure whether it will use the evaluation team from the prior evaluation, whether it will add members to the prior evaluation team, or whether it will select new evaluation team members."); *see also Shimmick Construction Company, Inc.*, GAO B-420072.3 (finding a protest challenging a corrective action must be raised within 10 days of when the corrective action scope is known).  The government asserts plaintiff's arguments are time barred under the Federal Circuit's decision in *Blue & Gold*, which held:  a plaintiff who "has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Blue & Gold Fleet, L.P.*, 492 F.3d at 1313.  Absent such "a waiver rule, a contractor with knowledge of a solicitation defect could choose to stay silent when submitting its first proposal," and should it "lose[] to another bidder, the contractor could then come forward with the defect to restart the bidding process, perhaps with increased knowledge of its competitors." *Id.* at 1314.  The government states, "[a]lthough *Blue & Gold* did not involve corrective action, this Court applies the same rule when a bidder fails to object to an error in the scope of a corrective action prior to a new award."  Def.'s Cross-MJAR at 11 (first citing *XPO Logistics Worldwide Gov't Servs. LLC v. United States*, 134 Fed. Cl. 783 (2017), *aff'd*, 713 F. App'x 1008 (Fed. Cir. 2018), then citing *CBE Grp., Inc. v. United States*, 138 Fed. Cl. 230, 236–37 (2018), and then citing *Inserso Corp. v. United States*, 961 F.3d 1343, 1350 (Fed. Cir. 2020) (applying *Blue & Gold* waiver rule and barring a protest in which the bidder could have anticipated a particular course of action)).  The government noted the Federal Circuit has not yet addressed whether *Blue & Gold* extends to corrective action. Tr. at 162:21–25.  As this is the government's alternative argument and the Court finds in the government's favor on its primary position, the Court declines to reach this question.

At oral argument, plaintiffs admitted the VSP does not detail a reevaluation process, and without showing the VSP requires the reevaluation to be price blind, plaintiff fails to show NARA's reevaluation deviated from the VSP. Tr. at 26:18–23 ("[PLAINTIFF]: I don't think [the VSP] contemplates a re-evaluation[.] THE COURT: So the vendor selection plan does not contemplate what the re-evaluation team would be? [PLAINTIFF]: It does not contemplate any of that."). Further, whether the VSP requires a price-blind reevaluation is only relevant if the non-price-blind reevaluation resulted in bias. Pl.'s MJAR at 13. Plaintiff argues the non-price-blind reevaluation resulted in bias because "NARA had already awarded the Task Order to EMCOR once, and EMCOR proposed nearly the lowest price." *Id.* As the small difference in price, [XXXX], is unlikely to meaningfully sway the evaluators, plaintiff's only remaining argument is the evaluation team was biased as "NARA had already awarded the Task Order to EMCOR once." *Id.* Taking plaintiff's argument to its extreme would result in the Court improperly second-guessing every agency corrective action using the same evaluation team and every corrective action where the agency again awards the contract to the original awardee. Accordingly, without "clear and convincing evidence" of a "specific intent to injure the plaintiff," the Court finds plaintiff's argument is insufficient to overcome the presumption that "[g]overnment officials are presumed to carry out their duties in good faith." *Spezzaferro*, 807 F.2d at 173; *Galen Med. Assocs., Inc.*, 369 F.3d at 1330 (citing *Info. Tech. Applications Corp.*, 316 F.3d at 1323 n.2).

Aside from reasserting its arguments about NARA's assessment of strengths and weaknesses, which the Court addresses *supra* Section IV, plaintiff's only allegation of bad faith is an alleged contact between Mr. Bartell and a prior LB&B program manager, who LB&B suspects is Mr. Hayes and believes "is a current EMCOR program manager." Pl.'s Reply Disc. Mot. at 4. Although plaintiff argues NARA's conduct is "hard to explain absent bad faith," *id.* at 5 (citation omitted), plaintiff concedes, "[t]he fact that Mr. Bartell had a business relationship with a former program manager at the Archives facilities is to be expected and not a cause for concern." *Id.* at 4; *see* Joint Stip. Ex. at 7–8 (General engineer job description provides Mr. Bartell will have "Contacts . . . with persons outside the agency[, including] contractors" and notes the "purpose of contacts" are to further the general engineer's duties). Plaintiff asserts, "NARA has either taken steps to conceal its connection to . . . Mr. Hayes and Mr. Smith and, by extension, EMCOR, or is attempting to fudge the record to protect its Reevaluation." Pl.'s Reply Disc. Mot. at 5. Plaintiff derives this from the fact that Mr. Bartell's declaration does not name the program manager with whom Mr. Bartell worked. In response, the government characterizes plaintiff's suggestion Mr. Bartell must have spoken to Mr. Hayes about LB&B issues as "rank speculation." Tr. at 62:9–10. Rather than showing irrefragable proof of bad faith regarding the non-price-blind reevaluation or the evaluation team composition generally, plaintiff admitted, "I'm not suggesting anything nefarious." Tr. at 118:16–18. Instead of striving to meet the "irrefragable proof" standard, plaintiff urges a lower standard by asking the Court to consider the "sum total" of events and briefing. Tr. at 158:21–159:4, 159:9–10 ("[PLAINTIFF]: Well, again, Your Honor, I think we have to look at this in sum total."). Plaintiff, however, admitted it "do[es] not have a case that" supports its "sum total" standard. Tr. at 159:12–17. Accordingly, without "clear and convincing evidence" of a "specific intent to injure the plaintiff," the Court finds plaintiff's argument is insufficient to overcome the presumption, "[g]overnment officials are presumed to carry out their duties in good faith." *Spezzaferro*, 807 F.2d at 173; *Galen Med. Assocs., Inc.*, 369 F.3d at 1330 (citing *Info. Tech. Applications Corp.*, 316 F.3d at 1323 n.2).

Plaintiff also argues, unlike Mr. Edwards, Mr. Bartell and Mr. Pham lack personal knowledge of LB&B's performance as the incumbent which "resulted in a biased Re-Evaluation." [10]  Pl.'s MJAR at 14.  Plaintiff states, "of the five weaknesses assessed against LB&B, all but two of them originated from the individual evaluations of Mr. Bartell and Mr. Pham."  Pl.'s Reply Gov't at 7 (citing Remand AR at 4977–79 (John Bartell), 4982–88 (Ngan Pham), 5007 (Timothy Edwards)).  Plaintiff, however, neglects to mention that because Mr. Edwards is a member of the evaluation team, the consensus evaluation necessarily includes his assent.  Remand AR at 4925 (VSR).  Plaintiff conceded at oral argument the evaluation team unanimously decided EMCOR offered the best value, which, again, necessarily included Mr. Edwards' assent.  Tr. at 43:11–12; *see* Remand AR at 4925 (VSR) ("[T]he [evaluation team], in conjunction with the Contracting Officer (CO), unanimously agreed that EMCOR . . . offered the Best Value to the Government . . . .").  Further, Mr. Edwards served as the evaluation team's chairperson and as such he chaired evaluation team meetings to achieve consensus.  Remand AR at 4923 (VSR).  As "[g]overnment officials are presumed to carry out their duties in good faith," the Court must therefore presume Mr. Edwards' assented to the consensus evaluation in good faith, irrespective of any alleged bias on the part of Mr. Bartell or Mr. Pham.  *Spezzaferro*, 807 F.2d at 173.  As such, plaintiff fails to put forth even a plausible biased reevaluation claim.  *See id.*

Mr. Edwards aside, plaintiff's arguments toward Mr. Pham's and Mr. Bartell's personal knowledge are likewise suspect.  NARA employs Mr. Pham and Mr. Bartell full-time as "general engineer[s]."  Joint Stip. at 1–2.  Mr. Pham belongs to the Facility and Property Management Division ("BF"), and Mr. Bartell is part of the Space Planning and Projects Branch ("BFS").  *Id.*  One key duty of a general engineer is to ensure NARA facilities efficiently use energy and water.  Joint Stip. Ex. at 5–6 (General Engineer Job Description).  The general engineer's energy program evaluations are reviewed by management officials, but the recommendation of a general engineer is usually accepted without change.  *Id.*  Plaintiff admitted, given Mr. Bartell's position as the acting branch chief and general engineer, "[p]arts of the[] RFQ fall directly under his job description.  Tr. at 48:15–21.  Plaintiff also admitted Mr. Pham and Mr. Bartell's general engineer duties would make them aware of "core energy items."  Tr. at 49:11–18.

Considering Mr. Pham specifically, plaintiff stated Mr. Pham's role as a general engineer during LB&B's tenure would put "some parts of" "LB&B's performance directly under his purview."  Tr. at 47:16–48:12.  Given the duties of general engineers to assess energy and water efficiency at NARA facilities, evaluating LB&B's performance was within Mr. Pham's and Mr. Bartell's responsibilities.  Joint Stip. at 1–2.  Mr. Pham was under NARA's employ "for the period of time associated with LB&B's past performance evaluation and NARA's award decision," thus, given his job responsibilities, he could accurately evaluate LB&B's past performance.  Joint Stip. at 1–2.  The Court accordingly finds plaintiff has failed to show "evidence that [Mr. Pham] w[as] . . . inept."  *Spezzaferro*, 807 F.2d at 173.

As for Mr. Bartell, plaintiff agreed the RFQ permits evaluators to use personal knowledge but claimed Mr. Bartell lacked personal knowledge as "from the period of time from

---

[10] Plaintiff does not dispute Mr. Edwards' personal knowledge, stating, "he would have oversight for both [Archives I and II] facilities."  Tr. at 53:1–4.

2010 to 2019, Mr. Bartell was not at [NARA]." Tr. at 46:2–17. In addition to his role as general engineer, from 6 January 2022 until 16 May 2022, Mr. Bartell served as the Acting Chief of the BFS Branch. Joint Stip. at 2; Joint Stip. Ex. at 14–18 (Acting Chief Job Description). In this role, Mr. Bartell supervised one other employee. Joint Stip. at 2. Although Mr. Bartell was not working for NARA during LB&B's past performance evaluation period, given his responsibility as a general engineer and as acting chief of the BFS, he has purview over LB&B's performance. Joint Stip. Ex. at 4–8. The parties also agree NARA "is a small agency in relative terms." Tr. at 49:21–23; Tr. at 52:1–6 (the government stating, "we think there are five to six agency employees at Archives I," in any event, "certainly less than ten [agency employees] at Archives I"). The government argued, as NARA is "a small agency[, the engineers] would certainly have awareness of what's going on." Tr. at 46:24–25. The parties also jointly stipulate all three evaluators' offices are "located in the Archives 2 building." Joint Stip. at 2. During oral argument, agency counsel added the relevant employees all sit within "the same office suite" approximately "the size of the courtroom with all of the staff and Mark Sprouse, the Facilities and Property Management Division." Tr. at 54:12–55:11. Agency counsel further noted the staff meets weekly and "there's a shuttle between the two buildings that staff routinely use when they need to go to one or the other buildings." Tr. at 55:12–16. Given the facilities division is relatively small, the relevant employees occupy the same office suite, and the weekly meetings, the Court finds it reasonable to conclude the employees would be familiar with each other's day-to-day dealings such that Mr. Bartell would have the requisite knowledge to evaluate LB&B's performance. *See* Tr. at 50:4–58:3. The Court accordingly finds plaintiff has failed to show "evidence that [Mr. Bartell] w[as] . . . inept." *Spezzaferro*, 807 F.2d at 173.

Although plaintiff states the Remand AR "does not include signed non-disclosures for Ngan Pham or John Bartell or any Conflict of Interest Statements," plaintiff does not otherwise show how Mr. Pham and Mr. Bartell's alleged lack of personal knowledge resulted in a biased reevaluation. Pl.'s MJAR at 14 n.3. Plaintiff also fails to explain how the reevaluation is a product of bias if Mr. Edwards, the evaluation team chairperson, assented to the consensus evaluation in good faith and without bias. The Court accordingly finds plaintiff has failed to show "evidence that the [evaluation] team members were inept, biased, or acted in bad faith," and would deny plaintiff's claim on the merits as well. *Spezzaferro*, 807 F.2d at 173; *Sanders*, 801 F.2d at 1331; *Galen Med. Assocs., Inc.*, 369 F.3d at 1330 (citing *Info. Tech. Applications Corp.*, 316 F.3d at 1323 n.2).[11]

---

[11] In response to plaintiff challenging Mr. Pham and Mr. Bartell's personal knowledge, the government moves to supplement the record with declarations from Mr. Pham and Mr. Bartell. *See* Def.'s Mot. Suppl. On 19 April 2022, the Court held a status conference to discuss the parties' cross-motions for supplementation, and during the status conference the parties' agreed to file a joint stipulation regarding the evaluators' positions within NARA. On 12 May 2022, the government filed this joint stipulation containing NARA organization charts and job descriptions for Mr. Bartell and Mr. Pham. *See* Joint Stip. On the government's motion to supplement, during oral argument, the government argued "[t]o the extent the Court still feels there's a gap in terms of what [Mr. Pham and Mr. Bartell's] knowledge is, then supplementation would be appropriate." Tr. at 47:1–3. Given the parties' joint stipulation, the Court finds there is not a gap in the record, and the Court accordingly denies as moot the government's motion to supplement, ECF No. 52. In response to the government's motion to supplement, plaintiff moves the Court for additional discovery. *See* Pl.'s Disc. Mot. Plaintiff must present "sufficient well-grounded allegations of bias to support supplementation" which "rests on hard facts, not merely suspicion or innuendo." *Price Gordon Servs. v. United States*, 139 Fed. Cl. 27, 50 (2018) (citation omitted). In its motion for additional discovery, plaintiff does not show "hard facts" or "irrefragable proof" of bad faith, instead plaintiff states it will not preview for the Court the

## VI. Injunctive Relief

Plaintiff requests "this Court issue a permanent injunction enjoining and affirmatively restraining NARA from proceeding with a Task Order award to EMCOR." Second Am. Compl. at 56. The Court considers the following factors when determining whether to issue a permanent injunction: "(1) whether . . . the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). According to the first factor, plaintiff is not entitled to injunctive relief because plaintiff does not prevail on the merits. The Court therefore does not consider the remaining factors and denies plaintiff's request. *Info. Tech. & Apps. Corp. v. United States*, 51 Fed. Cl. 340, 357 n.32 (2001) ("Absent success on the merits, the other factors are irrelevant."), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003).

## VII. Conclusion

For the foregoing reasons, the Court **DENIES** plaintiff's motion for judgment on the administrative record, **GRANTS** the government's and defendant-intervenor's cross-motions for judgment on the administrative record, and alternatively **GRANTS** the government's and defendant-intervenor's motions to dismiss under RCFC 12(b)(6). The Court also **DENIES as MOOT** the government's motion to supplement and **DENIES as MOOT** plaintiff's motion for additional discovery. The Clerk is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge

---

testimony it expects to develop if granted additional discovery. Pl.'s Disc. Mot. at 6–7 ("Without previewing to the Court the testimony LB&B expects to develop in deposing Mr. Bartell and Mr. Pham . . ."). The Court accordingly finds no reason to allow plaintiff to conduct discovery. Regardless, as plaintiff noted, its motion for additional discovery is contingent on whether the Court grants the government's motion to supplement. The Court denies as moot the government's motion to supplement, so the Court also denies as moot plaintiff's motion for additional discovery, ECF No. 55.